No. 14592

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

K. E. ADAMS,

Plaintiff and Respondent,

-vs-

WILLIAM RICHARD CHILCOTT,

Defendant and Appellant.

Appeal from: District Court of the Thirteenth Judicial District,
Honorable C. B. Sande, Judge presiding.

Counsel of Record:

For Appellant:

Stacey and Nye, Billings, Montana
Jerrold L. Nye argued, Billings, Montana

For Respondent:

Anderson, Symmes, Brown, Gerbase, Cebull and Jones,
Billings, Montana
James L. Jones argued, Billings, Montana

Submitted: May 3, 1979

Decided: JUL 9 1979

Filed: JUL 9 1979

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Both parties appeal from a declaratory judgment entered in the District Court for Carbon County, the Honorable C. B. Sande presiding without a jury. Pursuant to Rule 23(h), M.R.App.Civ.P., defendant was stipulated as appellant and plaintiff as respondent.

Lying at the root of this appeal is a 640 acre ranch in Carbon County which was sold by appellant to respondent. The ranch was formerly part of a larger property owned by appellant's grandfather. In 1937 and again in 1962, the grandfather obtained water purchase contracts and stock subscription agreements which entitled him to buy certain amounts of water from the Rock Creek Water User's Association. There is no dispute that these rights were owned in conjunction with the undivided property. The record discloses that the only actual use of water under the contracts was for irrigation during a brief period in 1966. Upon the death of appellant's grandfather in 1969, the ranch and the contract water rights were divided equally between appellant and his cousin. As this case does not concern the cousin's "inheritance," the terms ranch or property will hereafter refer only to that which "passed" to appellant.

According to appellant, his portion of the contract water rights continued to be owned with the ranch. This statement is born out by the fact that when appellant mortgaged the land in 1969 the water rights were treated as appurtenant to it.

Attempts to sell the ranch began in 1971. Over several years it was listed with various area realtors and unsuccessful negotiations for sale were begun with several prospective

buyers.  The price sought during this period is most often referred to as being approximately $240,000.  Appellant testified that sometimes this figure included the contract water rights but sometimes did not.  Further, he said he never intended to include a gravel deposit located on the ranch.  This last assertion was contradicted by an area realtor who testified that appellant pointed the gravel pit out "as a real asset of the ranch" and indicated it was included with the rest of the property.

In late 1975 respondent offered to buy the property, including "the gravel piles" and "all water rights" for $185,000.  Even though a local bank, as holder of the mortgage on the property, put pressure on appellant to accept the offer, he rejected it as too low.  After this occurred, the negotiations between the parties were conducted by attorney-realtor William Morse who represented respondent as an undisclosed principle.

Morse testified that the catalyst for the sale was appellant's representation that there was a contract with a third party for the sale of gravel from the ranch.  Upon learning this, respondent offered $201,500 for the property.  Appellant agreed, and a buy-sell agreement containing the following language was prepared and signed by both parties:

> "All of the seller's rights, titles and interest in and to the above-described real property shall be deemed included in this sale, including all water, ditch and irrigation rights which the seller has currently used on the premises.
>
> ". . .
>
> "It is agreed that the parties are not aware of the exact status of the oil, gas and mineral rights on the premises at the present time. However seller agrees to convey buyer 50% of all the oil, gas and minerals on all the prem-

ises if seller owns at least 50% thereof; in the event seller owns less than 50% of all the minerals on all the lands he hereby agrees to convey all such oil, gas and mineral rights upon the premises as he does own."

A contract for deed was prepared by appellant's attorney and signed by the parties on May 11, 1976. It made no mention of water rights but did include a clause dealing with the minerals in substantially the same language as the buy-sell agreement. Before the contract was signed the parties disagreed as to whether appellant was to reserve 50% of the sand and gravel rights. They completed the sale but executed a supplementary agreement to the effect that the sand and gravel rights would be settled later.

An associate of appellant's attorney handled the details of the transaction and wrote a letter to Morse which reads:

"The buy-sell agreement does not specifically set forth the manner in which the water is to be transferred, but I propose that we handle that aspect as follows: Mr. Chilcott will assign to Mr. Adams both the stock purchase agreements and water purchase contracts which he holds. Mr. Adams will then execute an assignment of those rights back to Mr. Chilcott, which will be held in escrow for use in the event of default. I feel this arrangement is better for your client than merely placing the assignments from Mr. Chilcott to Mr. Adams in escrow since the stock in the Water Association must be voted by its record owner, and I assume that Mr. Adams would not want to wait the life of the contract to become record owner. The transfer of the water contract agreements requires approval by the Board of Directors of the Water Association, but I have been in contact with that organization and anticipate no problems on that end whatsoever." (Emphasis added.)

Morse testified as follows:

"Q. Did you have occasion to discuss with Mr. Barnard, attorney in Mr. Tolliver's office, as to how the water would be transferred? A. I did.

". . ."

-4-

"Q. Was there any question with respect to your conversation, either before or after this letter with Mr. Barnard, as to whether or not the Cooney Dam [contract] water was to be assigned to Mr. Adams as indicated in Mr. Barnard's letter? A. Not in the least, we had gone over it in detail with his office, we also had some of the Cooney Dam, call it Rock Creek Water Association, or something like that, forms, that are to be used for that sort of thing, and we discussed it in detail; it was purely a perfunctory matter that needed to be done as far as I was concerned, and I was left with the impression that was what he thought also."

On the day the contract was executed, respondent deposited $57,500 in escrow with instructions not to release it until adequate evidence of title was provided. Although the escrow money was released approximately two months later, we have not been presented with any information as to whether evidence of title was actually presented.

Respondent raised hay on the ranch in 1976 and harvested 220 tons in three cuttings. The contract water was not needed that year as other decreed water was sufficient. The next year, respondent spread fertilizer on his hay pasture in hopes of obtaining a 300 ton yield. The summer was particularly dry and the decreed water was not enough to maximize production. Appellant denied that the contract water rights had been transferred and would not allow respondent to have any of that water until late in the summer. Only 68 tons of hay was cut. Cattle were allowed to graze on part of the crop land because, as respondent asserts, the water came too late and the crop was already ruined. Appellant contends the grazing cattle were the cause of the crop loss.

In August 1976 respondent filed a declaratory judgment action with regard to the sand and gravel. The complaint was amended in January 1978 and sought damages for appel-

-5-

lant's failure to transfer the water purchase contracts as well as for the crop damage alleged to have been caused by that failure. Appellant answered, asserting a 50% interest in the sand and gravel and denying the transfer of the water purchase contracts.

After a nonjury trial and pursuant to findings of fact and conclusions of law, judgment was entered declaring respondent to own the contract water rights buy only 50% of the sand and gravel. In addition, appellant was found to be liable for the crop damage caused by withholding the water and was ordered to execute a warranty deed to the premises. We affirm.

On appeal the following issues have been presented:

1. Whether the District Court erred in ordering appellant to execute a warranty deed.

2. Whether the District Court erred in declaring respondent and appellant to each own 50% of the sand and gravel.

3. Whether the District Court erred in declaring the rights represented by the water purchase contracts to be owned by respondent.

4. Whether the award of damages for crop loss was error.

5. Whether the District Court erred in imposing on each party the duty to pay its costs and attorney fees.

We note that appellant counterclaimed for damages incurred as a result of the nonrelease of the escrow money. On appeal it is argued that the trial judge erred in not deciding the issue. No evidence was presented on this aspect of the case, and we will not consider it. Mont. Ass'n of Underwriters v. State (1977), _____ Mont. _____, 563 P.2d 577, 581, 34 St.Rep. 297, 302.

The first issue is the propriety of the order to appellant to execute and deliver a warranty deed. The contract for deed called for the delivery of such a deed in escrow. In addition to the specific relief prayed for in his complaint, respondent sought "such other relief as to the Court may seem proper." We note that courts have "the power to grant complete relief under [their] equity power." Foy v. Anderson (1978), ____ Mont. ____, 580 P.2d 114, 116, 35 St.Rep. 811, 814. No reason has been brought to our attention why a warranty deed should not be executed and this portion of the order was within the trial court's jurisdiction.

We next turn to the asserted reservation by appellant of 50% of the sand and gravel rights. In both the buy-sell agreement and contract for deed, 50% of appellant's "oil, gas and mineral rights" were reserved to him if, to begin with, he owned more than 50% thereof. To be effective, a reservation must be expressed. Section 67-1523, R.C.M. 1947, now section 70-1-520 MCA. There being no mention of sand and gravel on the face of the document, the only way any rights thereto can be reserved is if they are included in the term "oil, gas and mineral." We recognize that there is a split of authority on the question, 54 Am.Jur.2d Mines and Minerals §8, p. 192, but decline to announce an applicable rule in Montana. The split of authority, the voluminous litigation the issue has caused and the absence of pertinent Montana case law indicate that the term "mineral", as applied to sand and gravel, is inherently ambiguous. As such, extra care should be taken to expressly include or exclude sand and gravel from the term "mineral".

Where an ambiguous term is used, the intent of the parties will govern its construction and extrinsic evidence can be used to discover that intent.  Hill Cattle Corp. v. Killorn (1927), 79 Mont. 327, 340-41, 256 P. 497, 502. Appellant's mother and girlfriend testified that at one point in the negotiations for sale, Morse asked them to step across the street with appellant for coffee while he conferred with the undisclosed principle.  Upon their return he informed them the principle would go half and half on the minerals and sand and gravel.  This is sufficient evidence upon which to conclude that the parties intended the term "mineral" to include sand and gravel.

The next question for our consideration pertains to the transfer of the contract water rights.  The phrase "All of the seller's rights, titles and interest in and to the above-described real property shall be deemed included in this sale, including all water, ditch and irrigation rights which the seller has currently used on the premises," appearing in the buy-sell agreement is the only reference to water rights.  It indicates what is to be transferred rather than what is to be retained and because it does not expressly except the contract water rights, it cannot reserve them. Section 67-1523, R.C.M. 1947, now section 70-1-520 MCA.

The contract water was used in 1966 to irrigate the land and was thus beneficially used in connection with the ranch. By statute, section 67-211, R.C.M. 1947, now section 70-15-105 MCA, and by a long line of cases, the most fitting of which is Schwend v. Jones (1973), 163 Mont. 41, 515 P.2d 89, the law is well settled in Montana that when a thing is used for the benefit of land, it is deemed appurtenant to the land.  It is accepted that an appurtenant water right

-8-

may be transferred apart from the land which it benefits. But, if the property is transferred without an express reservation of the appurtenant water rights, they accompany the land. Section 67-1523, R.C.M. 1947, now section 70-1-520 MCA; Schwend, supra, 163 Mont. at 45; Yellowstone V. Co. v. Asso. Mtg. Investors (1930), 88 Mont. 73, 84, 290 P. 255, 70 A.L.R. 1002. This is as true for contract rights as it is for appropriated or decreed rights. Schwend, supra, 163 Mont. at 45.

In addition, appellant, acting through his attorney, outlined how the contract rights would be transferred. This created a circumstance which led respondent to act to his detriment in reliance on the representation. Appellant is thus estopped from asserting that the rights in question were not transferred. Smith v. Krutar (1969), 153 Mont. 325, 332, 457 P.2d 459.

Having determined the water rights were transferred with the ranch, it follows that any withholding of them by appellant was wrongful and that he is liable for the damage caused by his act. The trial court fixed damages at $11,368 and on review, our function is to determine if there is substantial credible evidence to support the finding. Cameron v. Cameron (1978), ____ Mont. ___, 587 P.2d 939, 945, 35 St.Rep. 1723, 1729.

Respondent's son-in-law testified that cattle were grazed in the hay pasture only after the crop was ruined. There was testimony that the average value per ton of hay was $70. Respondent testified that his production cost was $21 per ton. This indicates a $49 per ton loss. Respondent further testified that with the fertilizer he applied, the land should have yielded 300 tons of hay. The contention

that it was impossible for respondent to spread this much fertilizer for the cost incurred is made for the first time on appeal and cannot be considered by this Court. Respondent was able to cut only 68 tons of hay and thus lost 232 tons. At $49 per ton, this comes out to $11,368, the amount of the judgment. There is substantial credible evidence to support the finding that damage in the amount of the judgment was caused by appellant wrongfully withholding the water.

Finally, the contract for deed provided:

"If either party to this agreement shall institute suit against the other to enforce rights or duties under this agreement and obtain a valid judgment, the losing party agrees to pay all costs, expenses, and attorney's fees of the prevailing party."

Since appellant lost on the water rights and damages issues, and respondent lost on the sand and gravel question, the trial court order that each party bear his own costs and attorney fees was proper.

The judgment of the District Court is affirmed. The counterclaim for damages from nonrelease of the escrow money is remanded.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

-10-