NORKEN CORPORATION, an Alaska Corporation, Appellant/Cross–Appellee,

v.

Mazie M. McGAHAN d/b/a McGahan Enterprises and Merrill McGahan d/b/a Merrill Enterprises, Appellees/Cross–Appellants.

Nos. S–3052, S–3053.

Supreme Court of Alaska.

Nov. 15, 1991.

David P. Gorman, Wade & DeYoung, Anchorage, for appellant/cross-appellee.

Peter F. Mysing, Kenai, for appellees/cross-appellants.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

This dispute is between Norken Corporation, the current owner of three parcels of land in North Kenai Borough, and Mazie M. McGahan, the original grantor of those parcels. Although both parties agree that McGahan owns the gravel deposits on the parcels by virtue of deed reservations, they vigorously dispute the scope of that ownership. After protracted legal wrangling and a lengthy bench trial, the superior court held that the intent of the deed reservations was that McGahan retain mining rights to a portion of one parcel, but only royalty rights to the gravel underlying the rest of that parcel and the other two properties. Norken appealed; McGahan cross-appealed. We affirm in part and reverse in part.

### I

Mazie M. McGahan moved to Alaska from Michigan in 1952 and homesteaded 160 acres of land in the North Kenai area. In 1956 he received a patent to the land from the United States. One characteristic of the patented land, apparently important to McGahan in choosing where to settle, was the presence of extensive gravel deposits. Another important characteristic of McGahan's homestead was its bisection by the North Kenai Road.

In the early sixties, McGahan subdivided eighty acres of his homestead into a residential area called Aurora Heights. As he sold off the Aurora Heights properties, he routinely reserved the gravel rights. At trial, he testified that his intention in so doing was to prevent any future grantee from ruining the residential character of the neighborhood by extracting gravel.

In contrast to his plans for Aurora Heights, McGahan removed small quantities of gravel from the property involved in this lawsuit as early as 1954, although the superior court found that this operation

was embryonic as of 1966. In that year Stan Best, a principal in Peninsula Ready Mix, negotiated with McGahan for Peninsula to extract gravel it needed to fulfill a sizeable concrete supply contract. In 1967 Peninsula bought Tract 1 from McGahan for a purchase price of $10,000. A portion of Tract 1—an irregularly shaped, three acre parcel—encompassed at least part of the pit from which Peninsula was already extracting gravel. On the remaining portion, which included frontage on North Kenai Road, Peninsula erected buildings and established a storage area to support its concrete production operations.

The sale contract and the warranty deed to Tract 1 included essentially the same reservation of rights:

> The Sellers expressly reserve to themselves, their heirs, executors, administrators and assigns all oil, gas, coal, gravel and non-fissionable minerals in, on or under the surface of said land.

Peninsula continued to pay McGahan for gravel it extracted from the pit.

By June 1973, Kenneth Mearkle, d/b/a Northern Steel, was using an adjoining lot, Tract A, as the location for a gravel screening plant and a small machine parts store. At that time, Northern Steel bought Tract A (a 1.1 acre parcel with more road frontage than Tract 1) from McGahan for $12,-000. The warranty deed for Tract A contained a reservation similar to the Tract 1 deed:

> Grantors expressly reserve to themselves, their heirs, executors, administrators and assigns all oil, gas, coal and non-fissionable minerals in, on or under the surface of said land. Grantors also reserve all gravel rights.

McGahan testified at trial that he and Mearkle had an oral agreement that a specified portion of the property would be free from McGahan's right to mine gravel.

Peninsula apparently needed more space for its operations. In October 1973, with McGahan acting as intermediary, Peninsula bought Tract A from Northern Steel for $15,000. In January 1975 Peninsula bought another acre, Tract C, from McGahan for $4,000. The warranty deed for Tract C contained a reservation clause identical to that in the deed for Tract A.

According to the superior court, by 1980 or 1981 the gravel pit, which covered the rear of Tract 1 as well as land still owned by McGahan, had been mined to a depth of thirty or thirty-five feet below the grade level of North Kenai Road. Although some gravel may have been removed from the rest of the subject property, the court found that "[g]enerally, the front portions of Tract 1 and Tracts A and C were maintained at the grade level of the North Kenai Road."

Peninsula sold the three parcels to David Simonson in 1980. Although the record is unclear as to whether Simonson extracted any gravel between 1980 and 1982, it is clear that they did not extract gravel after 1982. Rather, they established a plant to manufacture ready-mix concrete, to which they brought gravel extracted from a pit several miles away. After shutting down the ready-mix operation, Simonson built a building on the property for use as a shop to paint their heavy equipment. Throughout this period, McGahan and his son extracted gravel from the pit and authorized periodic extractions by third parties. In order to gain access to the pit, one had to first get the permission of Simonson's agent and then cross the level portion of Tract 1.

Simonson sold the parcels to Ron Johnson in March 1987 for about $125,000. Johnson eventually conveyed the property to Norken Corporation, formed by him and others to develop the property. As Norken pursued plans to build a shopping mall on the land, McGahan initiated legal action to protect his access to the gravel and define his rights under the reservation clauses. After several court orders intended to preserve the status quo, the case finally came to trial in May 1988.

In a Memorandum of Decision and Judgment dated June 22, 1988, the superior court held that

> Norken owns Tracts A and C free from any right of McGahan to mine any gravel on those tracts. Similarly, Norken owns that portion of Tract 1 north of a certain

described line free from any right of McGahan to mine any gravel on Tract 1.... Norken's ownership of the remainder of Tract 1 is subject to McGahan's right to remove gravel from the tract with no liability of McGahan for breach of the covenant of quiet enjoyment or breach of any obligation to provide for subjacent support.

This holding allowed McGahan to continue extraction in the area that had been used for that purpose for the two decades since Peninsula first started mining on McGahan's property. However, the court forbade any expansion of the pit to land which had been maintained level with North Kenai Road. As for McGahan's right of access to the pit, the court found that an implied easement existed that ran along the south border of Tract C;[1] the court thus denied McGahan's claimed right of access across the front portion of Tract 1.

The crux of the court's decision concerning interpretation of the reservations consisted of reconciling them with warranties of quiet enjoyment that appeared in each deed.[2] To resolve the apparent conflict between the warranties and the reservations, the court looked to the circumstances surrounding the grants and to the conduct of the parties. After considering the oral agreement between Mearkle and McGahan concerning the front part of Tract A, as well as the "actual practice on the remainder of Tract A and Tract C and the front portion of Tract 1," the court concluded that

> McGahan's ownership of the gravel, though recognized, did not comprehend an unlimited license to remove gravel below grade level in any significant amount on Tracts A and C and the front (north) part of Tract 1. This result is consistent [with] use of that property, namely as an area for the storage of

[Peninsula's] equipment and for the production of concrete. It is also consistent with the fact that at least one building on Tract [1] was of a permanent nature and that Mearkle used the building on Tract A for a parts store.

. . . .

The activities of those persons owning or working on Tracts 1, A and C from 1967 on proclaim their understanding of the significance of McGahans' [sic] warranty of quiet enjoyment.

The court denied both parties' claims for damages and refused to award attorney's fees on the ground that neither party had prevailed. Norken appealed, and McGahan cross-appealed.

II

Both parties open their arguments by directing our attention to various "rules of construction," the proper use of which ineluctably leads to a conclusion in favor of the rules' proponent. This initial reliance on rules of construction is misplaced. We have long held that the touchstone of deed interpretation is the intent of the parties. *Hendrickson v. Freericks*, 620 P.2d 205, 209 (Alaska 1980); *Shilts v. Young*, 567 P.2d 769, 773 (Alaska 1977); *Rizo v. MacBeth*, 398 P.2d 209, 211 (Alaska 1965). The purpose of rules of construction, by contrast, "is not to ascertain the intent of the parties to the transaction. Rather, it is to resolve a dispute when it is otherwise impossible to ascertain the parties' intent." 6A R. Powell & P. Rohan, *Powell on Real Property* ¶ 899[3] at 81A–108 (1991); *see also Russell v. Geyser–Marion Gold Mining Co.*, 18 Utah 2d 363, 423 P.2d 487, 490 (1967) ("rule of construction [favoring grantees] should be subordinate and yield to the paramount rule that the intent of the

1. This route, called the "Norken Road," was constructed by Norken after commencement of the litigation as an attempt to comply with an interlocutory order of the superior court. Before construction of the Norken Road, the only access to the pit was across Tract 1 or Tract A.

2. The warranty deed for Tract C, for example, provides:

> And the said Grantors do hereby Warrant and will FOREVER DEFEND the said Grantees, their heirs and assigns, against any and all persons having or claiming any right, title or interest therein adverse to the said Grantees in the quiet and peaceable possession thereof.

parties is to be given effect if it can be ascertained").

The proper first step in deed construction is to look to the four corners of the document to see if it unambiguously presents the parties' intent, without resort to "rules of construction." *E.g., Spurlock v. Santa Fe Pac. R.R.*, 143 Ariz. 469, 694 P.2d 299, 304 (App.1984) ("[a]ll jurisdictions agree"), *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 642 (1985); *Knadler v. Adams*, 661 P.2d 1052, 1053 (Wyo.1983). If the words of the deed taken as a whole are capable of but one reasonable interpretation, a court need go no further. Whether a deed is ambiguous is a question of law. *Knadler*, 661 P.2d at 1053. Thus, in reviewing the first step of deed interpretation, this court is not bound by the determination of the lower court. *Walsh v. Emerick*, 611 P.2d 28, 30 (Alaska 1980).

If the deed is ambiguous, the next step in determining the parties' intent is a consideration of the facts and circumstances surrounding the conveyance. *E.g., Wirostek v. Johnson*, 266 Or. 72, 511 P.2d 373, 374–75 (1973); *Russell*, 423 P.2d at 490; *cf. Rizo*, 398 P.2d at 211–12 (to determine whether instrument is deed or security in absence of writing, look to "all of the facts and circumstances of the transaction in which the deed was executed, in connection with the conduct of the parties after its execution"). Conclusions about the parties' intent drawn by the trial court after sifting and weighing such extrinsic evidence are conclusions of fact. *Rizo*, 398 P.2d at 212. This court will not disturb those findings on review unless they are clearly erroneous—that is, unless a review of the entire record engenders "a firm and definite conviction ... that a mistake has been made." *Martens v. Metzgar*, 591 P.2d 541, 544 (Alaska 1979); Alaska R.Civ.P. 52(a).

Only if these two steps do not resolve the controversy should the court resort to rules of construction: "[I]t is essential that a court first attempt to determine and interpret the intention of the parties from the documents and the surrounding circumstances before applying any of the canons of construction. The intent of the parties is the polestar for interpreting a deed...." 6A R. Powell & P. Rohan, *Powell on Real Property* ¶ 899[3] at 81A–108 (1991).

### III

### A

The superior court spent little time on the question of ambiguity. It merely pointed out that in addition to the gravel reservation, the deeds warranted quiet and peaceable possession of the premises. Given that quiet possession of the premises and removal of the gravel are mutually exclusive, the court proceeded directly to a consideration of the facts and circumstances in order to determine where the grantees' right to quiet possession ended and McGahan's right to remove gravel began.

McGahan argues that "[t]here is absolutely nothing unclear or ambiguous about the gravel reservation clauses," in that the clauses specifically reserve his rights to the gravel. He acknowledges that the reservations do not address access, but argues that it is "universally recognized" that a reservation of mineral rights carries with it "so much of the surface of the estate as is necessary to extract the minerals." He also points to universal recognition that the mineral estate is dominant over the surface estate. Concerning the warranty of quiet enjoyment, McGahan argues that it does not conflict with the reservation of gravel rights. He points out that this warranty is generally considered synonymous with the covenant of warranty, which only guarantees that there is no defect in the title which the grantor purports to convey.

McGahan is correct that the superior court's reliance on the warranty of quiet enjoyment is mistaken. That warranty only guarantees the validity of grantee's title to the land deeded away as against claimants with paramount title. 6A R. Powell & P. Rohan, *Powell on Real Property* ¶ 900[2] at 81A–144 (1991); *see* 3 *id.* at ¶ 411[3], 34–102 (1991). ("The function of covenants of warranty ... is to give assur-

ances concerning the estate conveyed rather than to guide the construction of the conveyance as to the scope of the rights conveyed."). Thus, reliance on the warranty of quiet enjoyment begs the relevant question of what was given (and reserved) in the first place.

■ The superior court's underlying instinct, however, seems correct: A reservation that apparently nullifies the grant is on its face ambiguous. *See Farrell v. Sayre*, 129 Colo. 368, 270 P.2d 190, 192 (1954). In this case, the entire property consists of gravel deposits which can only be extracted by destruction of the surface. There thus seems to be a conflict between giving Peninsula, for example, the right "TO HAVE AND TO HOLD the said premises ... FOREVER," and reserving the right in effect to destroy the premises at will. On the one hand, the parties could have intended that the surface rights be uncertain and subject entirely to McGahan's discretion in removing gravel. On the other hand, the parties could intend that the reservation merely entitled McGahan to royalties when and if the deposits are extracted. Theoretically, the parties could even have intended that extraction occur on some parts of the property, but not on others. None of these intentions is clear from the face of the deed, nor does any of them conflict with the face of the deed.[3]

■ In arguing that the deeds are unambiguous as a matter of law, both parties assume that gravel is a mineral. They base their arguments concerning access and extraction rights on doctrines that apply in cases where the "mineral estate" is severed from the "surface estate." Courts, however, are virtually unanimous in holding that gravel is not a "mineral" in the legal sense of that word. *E.g., Anchorage Sand & Gravel Co. v. Schubert*, 114 F.Supp. 436, 437–38 (D.Alaska 1953); *Moser v. United States Steel Corp.*, 676 S.W.2d 99, 102 (Tex.1984) (sand and gravel belong to surface estate as matter of law, not included in blanket grant of "other minerals").[4] These cases generally deal with ownership of sand and gravel deposits under a blanket reservation or grant of minerals. Although ownership is not at issue here, it is not at issue because of the specification of gravel rights in the reservation, not because gravel is a mineral. Unless this court were prepared to rule that gravel is a mineral, there seems little reason to apply mineral doctrines as a matter of law.

■ The question of what is a mineral is a vexatious one, generating almost as many reasons why gravel is not a mineral as there are cases that reach that conclusion. *See Miller Land & Mineral Co. v. State Highway Comm'n*, 757 P.2d 1001, 1003–04 & n. 2 (Wyo.1988) (noting that courts and commentators have relied on "[s]urface doctrine, special value, manner of enjoyment, knowledge of existence, popular meaning, commercial value, and scien-

---

**3.** Both sides argue that the other's interpretation would render the deed "meaningless." Although the different interpretations would affect the relative values of the parties' rights, it is not accurate to say that any one interpretation would make the remaining rights meaningless. For example, to give someone the ownership of a surface that over time will be destroyed is not meaningless; the right is just worth less than ownership of a surface that will not be destroyed. By the same token, reservation of royalty rights without access rights is not meaningless, merely less valuable than reservation of access rights. The value of a particular right—and whether price paid correlates with value received—obviously depends on the facts and circumstances of the individual case.

**4.** *See also Farrell,* 270 P.2d at 192; *Roe v. State ex rel. State Highway Dep't,* 103 N.M. 517, 710

P.2d 84, 87 (1985), *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); *Holland v. Dolese Co.,* 540 P.2d 549, 550–51 (Okla.1975); *Whittle v. Wolff,* 249 Or. 217, 437 P.2d 114, 117 (1968); *State Land Bd. v. State Dep't of Fish & Game,* 17 Utah 2d 237, 408 P.2d 707, 709 (1965) (gravel not a mineral under usual circumstances); *Miller Land & Mineral Co. v. State Highway Comm'n,* 757 P.2d 1001, 1004 (Wyo. 1988); 54 Am.Jur.2d *Mines and Minerals* § 8 (1971); 58 C.J.S. *Mines and Minerals* § 2 (1948). *But see Adams v. Chilcott,* 182 Mont. 511, 597 P.2d 1140, 1144 (1979) (whether gravel is a mineral is "inherently ambiguous").

Interestingly, McGahan testified at trial that he specified gravel in the reservations based on his attorney's opinion that a blanket mineral reservation would not include gravel.

tific meaning" in resolving definitional problem). A concern that permeates the courts' attempts to deal with gravel rights is that gravel, although commercially valuable as an extractable resource, is also the essence of the surface that is conveyed. *See, e.g., Farrell*, 270 P.2d at 192; *State Land Bd. v. State Dep't of Fish & Game*, 17 Utah 2d 237, 408 P.2d 707, 708 (1965). Rather than consider gravel part of the "mineral estate," the tendency has been to include gravel rights as part of the "surface estate." *Moser*, 676 S.W.2d at 102; *see Miller Land & Mineral Co.*, 757 P.2d at 1004. We join this overwhelming consensus and hold that gravel is not a mineral. Thus, gravel rights—even when granted or reserved in the same clause as mineral rights—are not part of the "mineral estate."

■ The nature of gravel as the essence of the soil illustrates why it would be inappropriate to import mineral doctrines as a matter of law to the circumstances of this case. As McGahan points out, the mineral estate is the dominant estate, carrying with it the right to make such use of the surface as is reasonably necessary to remove the minerals. *E.g., Moser*, 676 S.W.2d at 103 (dominance of mineral estate "is an imperative rule of mineral law"). This right of reasonable use does not depend on whether the mineral estate arises from a grant or reservation. 58 C.J.S. *Mines and Minerals* § 159 (1948).[5] The purpose of this doctrine is to effect an "accommodation" between the surface and mineral estates. *Spurlock*, 694 P.2d at 309. Courts have noted that the rights of

the mineral estate "are to be exercised with due regard for the rights of the owner of the servient estate." *Getty Oil Co. v. Jones*, 470 S.W.2d 618, 621 (Tex.1971); *see also Hunt Oil Co. v. Kerbaugh*, 283 N.W.2d 131, 135–36 (N.D.1979); *Flying Diamond Corp. v. Rust*, 551 P.2d 509, 511 (Utah 1976). This accommodation is necessary—for example, in the oil and gas context—because the mineral owner can only reach its minerals by literally going through the surface of the land.

Such an accommodation is impossible in a situation such as this case, where removal of the gravel necessarily means destruction rather than mere use of the surface (or where preservation of the surface necessarily means not disturbing the gravel). In the analogous situation of whether a grant of minerals includes the right to surface mine for coal—and thus to destroy the surface—the rule of mineral dominance has yielded to heroic efforts by courts to determine intent through reference to surrounding facts and circumstances. *See generally* Annotation, *Right to Remove Minerals by Surface Mining*, 70 A.L.R.3d 383, 395 (1976) ("[A]s a general proposition, no particular word, phrase, or clause, standing alone, can be said to be decisive as to the permissibility of surface mining....."). Where, as here, the substance concerned is not a mineral in the legal sense and the deed contains no indication on its face that the parties intended the substance to be removed, we find no justification for concluding as a matter of law that a mere reservation of rights entails the right to destroy the surface of the land.[6]

**5.** Norken's "developing trend of decisions [that] favor the interests of surface owners over mineral interests" is less than overwhelming. In fact, as one of Norken's sources concludes, the cases that tend to balance surface owners' hardships "do not, however, depart from the underlying theory of mineral dominance. Case law tempering the doctrine of mineral dominance is clearly the minority view today...." Hultin, *Recent Developments in Statutory and Judicial Accommodation Between Surface and Mineral Owners*, 28 Rocky Mtn.Min.L.Inst. 1021, 1066 (1983).

The one decision that Norken cites as evidence of this trend actually refutes Norken's argument: "There may be only one manner of

use of the surface whereby the minerals can be produced. The lessee [of mineral rights] has the right to pursue this use, regardless of surface damage." *Hunt Oil Co. v. Kerbaugh*, 283 N.W.2d 131, 136 (N.D.1979) (quoting *Getty Oil Co. v. Jones*, 470 S.W.2d 618, 622 (Tex.1971)). It seems clear in this case that there is only one means of removing the gravel—strip mining the surface.

**6.** McGahan presents no cases which conclude to the contrary. His cases concerning "universal recognition" of the mineral estate's right to use the surface almost all pertain to oil and gas; of the non-oil and gas cases, one concerns coal and the other helium. *See Aleut Corp. v. Arctic Slope Regional Corp.*, 484 F.Supp. 482, 486

## B

As mentioned at the outset of this discussion, if a deed is not unambiguous as a matter of law, the court must then look at surrounding facts and circumstances to determine the parties' intent. We have suggested that this inquiry can be broad, looking at "all of the facts and circumstances of the transaction in which the deed was executed, in connection with the conduct of the parties after its execution." *Rizo*, 398 P.2d at 211–12. This factual determination after a bench trial will be overturned on review only if it is clearly erroneous. Alaska R.Civ.P. 52(a).

In this case the trial court concluded, based on an oral agreement as to part of the property and on actual practice as to other parts, that the parties' intent was that McGahan should have extraction rights only as to the extant pit at the rear of Tract 1. Although this decision has the effect of perpetuating over two decades of practice, both parties claim on appeal that the court clearly erred in this determination. A review of the entire record, however, does not engender "a firm and definite conviction" that the trial judge made a mistake in arriving at a factual determination that was somewhat short of what either party would have desired. *Martens*, 591 P.2d at 544.

Several aspects of the record support the trial court's conclusion. Foremost is the basic fact that McGahan and Peninsula actively developed the pit on one portion of the property while Peninsula set up a permanent structure on another part of Tract 1 and Mearkle set up a permanent structure on Tract A. This activity belies Norken's assertion that the parties never intended that McGahan should have any extraction rights whatsoever, while simultaneously casting doubt on McGahan's assertion

that each party intended that the whole of each parcel should be vulnerable in perpetuity to complete excavation.

Next is McGahan's admission that virtually identical reservations in Tracts 1, A, C and the Aurora Heights subdivision meant three different things. While claiming that he had the right to extract every stone from Tract 1 by virtue of the reservations, he admits that he did not have that right with respect to at least the front portion of Tract A and that extraction rights were not the intention of the reservations in the Aurora Heights deeds. These admissions undermine his argument before this court that every gravel reservation clause must intend strip mining of the entire subject property.

Indeed, the most difficult aspect of the case, from McGahan's point of view, is explaining exactly what Peninsula received for over $30,000 (for all three parcels), if it did not receive at least some protection from an unfettered right by McGahan to extract gravel. After Norken's attorney established that Peninsula already had access to McGahan's gravel and to water to sort it with[7] before buying Tract 1, the following exchange took place at trial during cross-examination of McGahan:

Q: Okay, so that's what I'm trying to find out, sir, is what it was that he [Stanley Best of Peninsula] acquired by buying Tract 1 from you. On direct you said that he got a source of gravel, he got water, he had to pay for the gravel only as needed.

A: That's right.

Q: And he only had to pay ten cents a yard for it.

A: That's right.

---

(D.Alaska 1980) (oil and gas lease); *Spurlock*, 694 P.2d at 303, 311 (helium); *Jilek v. Chicago, Wilmington & Franklin Coal Co.*, 382 Ill. 241, 47 N.E.2d 96, 98 (1943) (oil and gas); *White v. Bevier Coal Co.*, 364 Mo. 313, 261 S.W.2d 81, 83 (1953) (coal); *Hunt Oil Co.*, 283 N.W.2d at 135 (oil); *Ball v. Dillard*, 602 S.W.2d 521, 522 (Tex. 1980) (oil and gas lease). In none of those cases was there any controversy over whether the parties intended that the resource be extracted.

7. In agreements separate from purchase of the land, Peninsula paid a portion of the cost of developing a new well on McGahan's land and eventually paid for the water that it used in processing gravel. The water arrangements apparently were entirely pursuant to an unwritten understanding between McGahan and Peninsula.

Q: So what was the difference, what did he have after he bought.....

A: He had a place to set his shop up, to set his plant up, you know, his concrete plant.

Q: Right, but he would have had that anyway, would he not?

A: No, he didn't have it anyway prior to the time he bought the land.

Q: Oh, you would not have let him set his plant up if he did nòt buy Tract 1?

A: Oh, I wouldn't say I wouldn't, but he come and bought the land because that's what he wanted.

On the other hand, it is not very difficult to explain why McGahan would retain gravel rights even on a portion for which he did not have extraction rights: McGahan's right to royalties would preclude any future surface owner from competing with his continued extraction from his own property (and from the pit portion of Tract 1).

The court also heard valuation testimony that was not inconsistent with the determination that part of the property would be used for gravel extraction and part would not. McGahan's expert testified that the fee simple value of Tract 1 was probably about $7500 or $8000 an acre in 1967. Peninsula paid just over $3300 an acre for the land it received, or close to half the estimated fee simple value. Had the entire tract been free of McGahan's right to extract, the price should have been close to the full value. By the same token, however, if the entire parcel had been subject to McGahan's right to excavate at will, the price should have been closer to zero, insofar as excavation would destroy the surface.

This particular valuation seems to be a rough estimate based on the expert's contemporaneous purchase of nearby properties. During a hearing on a preliminary injunction, the trial court had heard testimony from Ron Johnson, the Norken promoter, that a nearby property was sold without a gravel reservation in 1966 for only $1000 an acre. In a subsequent interlocutory order, the judge apparently accorded at least some credibility to that testimony by holding that the consideration for Tract 1 was "in excess of other comparable sales of like property in 1967." Taking these two valuations together, it does not seem clearly erroneous to think that the price paid was less than if McGahan had only royalty rights, but more than if McGahan had complete extraction rights. We therefore conclude that the superior court's factual findings are not clearly erroneous.

IV

The essence of McGahan's initial complaint, which could only be reached after a determination of his right to extract gravel, centered on a claimed right to cross Norken's property in order to reach the gravel pit. McGahan premised this right of access on a number of easement theories, only one of which is before this court in McGahan's cross-appeal: the existence of an implied easement. "An easement by implication arises where there is (1) a quasi-easement at the time of contract of sale or conveyance, (2) which is apparent, (3) reasonably necessary for the enjoyment of the land retained or the land conveyed, and (4) continuous in nature." *Demoski v. New,* 737 P.2d 780, 783–84 (Alaska 1987); *see also Freightways Terminal Co. v. Industrial & Commercial Constr., Inc.,* 381 P.2d 977, 983–84 (Alaska 1963).

The superior court held that there was no implied easement as to Tract 1, but that there was as to the so-called Norken Road, which traverses a strip of Tract C. The court's reasoning is somewhat opaque:

The route across Tract 1 was not necessary to McGahan's enjoyment of Tracts A and C at the time of their severance since he had access to them from the North Kenai Road in 1967. At the time of McGahan's conveyances of Tracts A and C in 1973 and 1975 respectively, the Nurphy Street right-of-way existed along the east boundary of McGahan's remaining pit property. While the use of the access over Tract 1 might be a more convenient access from the pit to the North Kenai Road, it is not reasonably

necessary for McGahan's beneficial enjoyment of the pit, *Talbot's, Inc. v. Cessnun Enterprises, Inc.*, 566 P.2d 1320 ([Alaska 1977]). The Danna–Nurphy right-of-way provides a reasonable mode for McGahan's use of the pit.

This reasoning is opaque in that it does not seem to address the important question: At the time of the severance of *Tract 1*, was a route across *Tract 1* reasonably necessary for McGahan's enjoyment of his reserved rights in the *Tract 1* pit?

 The court held as a matter of fact that McGahan consistently used a route across Tract 1 to enter and leave the pit. In determining whether an implied easement exists, the existence of reasonable necessity is determined as of the time of severance, because it is at that time that the implied easement either does or does not arise. Having once arisen, the implied easement is not extinguished merely because the reasonable necessity ceases to exist. *Story v. Hefner*, 540 P.2d 562, 566 (Okla.1975); *Thompson v. Schuh*, 286 Or. 201, 593 P.2d 1138, 1145 (1979). The durability of the easement comes from the fact that an implied easement

> is based on the theory that whenever one conveys property he includes or intends to include in the conveyance whatever is necessary for its beneficial use and enjoyment and to retain whatever is necessary for the use and enjoyment of the land retained. An easement by implication is a true easement having permanence of duration and should be distinguished from a "way of necessity" which lasts only as long as the necessity continues.

*Story*, 540 P.2d at 566. We implicitly adopted this view of implied easements when we first acknowledged their validity:

> "Necessity" and "necessary" as we have used those words in this opinion when speaking of one of the requirements of an implied easement resulting from a preexisting quasi easement must not be

confused with what is known in the law as an easement or way by necessity. Such a way may arise where an owner of land conveys to another an inner portion which is entirely surrounded by lands owned by the conveyor or by the conveyor and another. In such a situation a right of access across the retained land of the conveyor is normally found, based upon public policy which is favorable to full utilization of land and [the] presumption that parties do not intend to render land unfit for occupancy. Such a way ceases when the necessity therefor ceases.

*Freightways Terminal Co.*, 381 P.2d at 984 n. 16 (citations omitted). Thus, a determination that no reasonable necessity existed as of 1988, when the superior court handed down its decision, does not resolve the question of whether an implied easement arose in 1967, the date of Tract 1's conveyance.

The court's apparent reliance on *Talbot's, Inc. v. Cessnun Enterprises, Inc.*, 566 P.2d 1320 (Alaska 1977), is only partially correct. The decision in *Talbot's* did indeed distinguish between mere convenience, which will not support the finding of an easement by implication, and reasonable necessity, which will support such a finding. *Id.* at 1323–24. But there, the determination concerned the alleged creation of the easement. *Id.* at 1322–23.[8] *Talbot's* therefore does not support the superior court's conclusion that the availability of the Norken Road precludes McGahan's right to an implied easement across Tract 1.

Given the somewhat confusing discussion of the access issue in the superior court's decision and the lack of clarity in the record, we must remand to the superior court for further determinations of fact. The first determination should be whether access to the gravel pit across Tract 1 was "reasonably necessary" in 1967. If so, an implied easement arose at that time and continues in spite of the current availability

8. Technically, *Talbot's* involved interpretation of a statutory easement under a portion of the Alaska Land Act, AS 38.05.320(b). *Talbot's*, 566 P.2d at 1321 & n. 1. The language and purpose of the statutory easement, however, seem virtually identical to the common law doctrine of implied easements.

of the Norken Road.[9] The court need go no further.

If the route across Tract 1 was not reasonably necessary in 1967—for example, because adequate access was available across Tracts A and C—then the court must determine whether current circumstances require the finding of a "way by necessity" along the Norken Road. If McGahan can reasonably gain access to the pit portion of Tract 1 by some other means, then a finding of a "way by necessity" is not appropriate.[10]

The superior court's interpretation of the deed reservations is AFFIRMED. The superior court's finding of an implied easement on the Norken Road is REVERSED and the case REMANDED for further proceedings consistent with this opinion.

MATTHEWS, Justice, with whom RABINOWITZ, Chief Justice, joins, concurring.

I concur in the result of the majority opinion, and in the reasoning. However, in proceeding from the conclusion that the deeds are ambiguous (Maj.Op. at 627), to a discussion of the extrinsic circumstances in order to determine what the deeds mean (Maj.Op. at 628–629 *et seq.*), the opinion digresses to examine the question whether gravel is a mineral. This question has not been raised by the parties and its resolution plays no role in today's decision. Because I believe that the expression of views on important legal subjects that are not briefed or argued should be avoided in judicial opinions, I do not concur in this discussion.

---

9. The superior court seems already to have found the existence of the other elements of an implied easement in that the route was in use at the time of the conveyance, its use was apparent, and its use was continuous.

10. Norken's other contentions concerning the court's denial of attorney's fees and costs and failure to dismiss the claims of McGahan's son are without merit.