OPINION
BOLGER, Justice.
I. INTRODUCTION
A prisoner recovered a medical malpractice judgment against the State of Alaska Department of Corrections. But when DOC paid the judgment, it deducted the expenses it had incurred for unrelated medical care *33 provided to the prisoner by outside providers. DOC then brought an action seeking a declaratory judgment that DOC had the statutory right to reimbursement from the prisoner for medical expenses incurred on his behalf. In this appeal, the prisoner's estate argues that only prisoners with access to the specified funding sources listed in the statute are liable for the cost of outside medical care. But we conclude that the statute entitles DOC to reimbursement from a prisoner regardless of whether the medical care is provided inside the prison or made available through an outside provider. We also conclude that the common fund doctrine does not require DOC to share the cost of the prisoner's attorney's fees for the medical malpractice action.
II. FACTS AND PROCEEDINGS
A. Legal Framework
The State has a statutory and constitutional obligation to provide necessary medical care to all prisoners regardless of their ability to pay.[1] Although the State provides medical care through DOC employees and contractors (in-house medical care), some medical conditions require treatment by outside providers (outside medical care)[2] Alaska Statute 88.30.028 sets out the prisoner's responsibility for medical expenses incurred during incarceration[3] - DOC has also adopted a regulation, 22 AAC 05.121, that outlines the prisoner's responsibility for payment for these services, with particular focus on the co-payment system.
B. Prior Litigation And First Appeal
Most of the underlying facts of this case have already been reviewed by this court in State, Department of Corrections v. Hendricks-Pearce. [4] Dewell Pearce was a prisoner from 1994 to 2008.[5] During his incarceration the State provided Pearce medical care for several conditions;[6] the State paid $147,494.94 to outside medical providers. While in custody, Pearce sued the State for medical malpractice and was awarded a $369,277.88 judgment against the State in 2008.[7] The State paid part of the judgment in May 2008, but withheld $140,847 as reimbursement for medical expenses that were unrelated to the injuries giving rise to the malpractice suit[8] In July 2008 the State filed an action for declaratory relief regarding its right to reimbursement.
The parties disputed whether the State was entitled to reimbursement from Pearce.[9] Because Pearce had been released before the *34 State filed its declaratory judgment action, the parties disagreed on whether AS 83.30.028 applied to former prisoners after their release from custody.[10] The superior court determined that AS 33.30.028 did not apply to former prisoners.[11] It therefore dismissed the State's suit and ordered the State to pay Pearce $140,847 (the amount the State had withheld from the original medical malpractice judgment) plus interest.
On appeal, this court reversed the superior court's ruling.[12] We stated that "[the primary goal of AS 38.30.028 is reducing medical costs"[13] and observed that "preventing the State from collecting from prisoners to the fullest extent possible would contravene the statute's cost-saving purpose." [14]! We therefore held that for the purposes of AS 33.30.028 the term "prisoner" includes former prisoners.[15]
This court remanded two separate issues-then not yet ruled upon-to the superior court: (1) whether AS 38.30.028 entitles the State to reimbursement for the cost of outside medical care from a prisoner without the funding - sources - identified in - AS 33.30.028(a); [16] and (2) whether the State's recovery, if allowed, was subject to a claim for attorney's fees and costs under the common fund doctrine.[17]
C. Remand And Subsequent Appeal
1. The parties' arguments
On remand, both parties moved for summary judgment. Each offered a distinctly different interpretation of AS 33.30.028. Pearce argued that the statute allows reimbursement for the cost of outside medical care only from the specified funding sources identified in subsection .028(a). Pearce's reading of the statute rested on two distinctions: the first distinction related to the type of medical care at issue (whether it was in-house or outside), and the second distinction compared prisoners with access to the specified funding sources listed in subsection .028(a) to those without.
Pearce argued that the statute distinguishes between two types of medical care-care "provided" by DOC (in-house medical care) and care "made available" by DOC (outside medical care)-and that under subsection .028(b), prisoners who lacked the .028(a)-specified funding sources are required to pay only for care "provided to them by the department." - Pearce therefore concluded that only prisoners with access to those specified funding sources were liable for the cost of outside medical care "made available" to them. Pearce contended that his reading of the statute was supported by the DOC regulation concerning prisoner co-payments. Pearce also argued that his attorney's fees should be deductible from any recovery made by the State under the common fund doe-trine.
The State argued that liability for the cost of outside medical care is imposed on all prisoners under AS 33.30.028, regardless of access to the .028(a)-specified funding sources, and that the legislative history does not support a distinction between medical care "provided" and care "made available." It contended that the statute itself made no distinction between in-house and outside medical care and that the regulation cited by Pearce was irrelevant to the statutory interpretation question because that regulation concerned co-payments rather than reimbursement.[18] Finally, the State argued that any recovery it made was not subject to a pro rata reduction for attorney's fees.
2. The superior court's analysis
The superior court ruled in favor of DOC on both issues. It determined that AS *35 33.30.028 entitled DOC to reimbursement for the costs of outside medical care from prisoners like Pearce who lacked the specified funding sources identified in subsection 028(a). - It determined that subsection .028(a) identified two categories of medical care-that "provided" and that "made available" to the prisoner. But the court conelud-ed that subsection .028(a) assigned financial liability for both categories of care to the prisoner. The court determined that the distinction between care "provided" and care "made available" is relevant only in subsection .028(b), which requires some level of payment for care only when the care is "provided to [the prisoner] by the department.[19] "
Turning to the legislative history of the statute, the court found that subsection .028(b) was intended to deter prisoners' frivolous use of medical care, rather than to limit a prisoner's liability under subsection .028(a). The court also found that the legislative record reflected the legislature's intent to grant the State the ability to recover the full cost of medical care "if at some point in the present or future the prisoner had sufficient funds."
The superior court also ruled that the common fund doctrine was not applicable because Pearce and his attorney did not confer a benefit upon the State through the medical malpractice lawsuit. It therefore concluded that DOC's recovery was not subject to a pro rata reduction for attorney's fees and awarded judgment against Pearce's estate in the amount of $149,730.95, including attorney's fees.[20] Pearce appeals both rulings.
III. STANDARD OF REVIEW
This case primarily involves a matter of statutory interpretation. Statutory interpretation is a question of law to which we apply our independent judgment.[21] However, "an agency's interpretation of a law within its area of jurisdiction can help resolve lingering ambiguity, particularly when the agency's interpretation is longstanding."[22] Whether the common fund doctrine applies to this case is also a question of law that we review independently.[23]
IV. DISCUSSION
A. A Prisoner Is Liable For The Costs Of Medical Care Provided Or Made Available.
As noted _ above, under _ AS 33.80.028(a) "the liability for payment of the costs of medical ... care provided or made available to a prisoner ... is, subject to (b) of this section, the responsibility of the prisoner. ..." (Emphasis added.) The following subsection, AS 33.30.028(b), states that "[the commissioner shall require prisoners who are without resources under (a) ... to pay the costs of medical ... care provided to them by the department. At a minimum, the prisoner shall be required to pay a portion of the costs based upon the prisoner's ability to pay.”
When we interpret this statutory language we begin with the plain meaning of the statutory text.[24] The legislative history of a statute can sometimes suggest a different meaning, but "the plainer the language of the statute, the more convincing contrary legislative history must be." [25] "Even if legislative history is 'somewhat contrary' to the *36 plain meaning of a statute, plain meaning still controls." [26]
Pearce argues that under subsection (a), in-house services are "provided" to a prisoner and outside medical services are "made available" to a prisoner. Pearce argues that subsection (b) means that a prisoner who has no insurance or other special resources under (a) is only required to pay a co-pay for in-house services and is not required to pay anything for outside medical services. In response, the State argues that all medical services are both "provided" and "made available" to a prisoner who receives medical care. The superior court concluded that this distinction makes no difference in this case because subsection (a) makes a prisoner liable for the costs of all medical care.
We conclude that the superior court's interpretation of this statute is most consistent with its plain meaning. The language of subsection (a) makes a prisoner liable for all medical care regardless of whether it is "provided" or "made available" to the prisoner. Subsection (b) requires minimum payment terms: the commissioner, at a minimum, must require prisoners without adequate resources to make a co-payment for services "provided" to them. But this subsection does not set a maximum payment for services "provided," nor does it set any limitations on liability for services "made available" to the prisoner.
The dissent argues that our reading of the statute renders superfluous the statutory clause making subsection (a) "subject to" subsection (b). However, under our interpretation, subsection (a) reflects a reasonable presumption that there will be dual lability for the prisoner and the listed collateral payers, which is made subject to subsection (b): if there are no collateral payers, and the prisoner is otherwise unable to pay in full, the commissioner must collect at least a minimum payment from the prisoner for all in-house services. Even if our reading of the statute did render the "subject to" clause redundant, such an interpretation is closer to the text than the substantial negative implication proposed by the dissenting opinion: namely, that the legislature's silence regarding the situation in which a prisoner has no collateral resources warrants the addition to subsection (b) of a provision relieving the prisoner of all responsibility to pay for outside services even if the prisoner has adequate personal resources to pay for those services.
In the same vein, the dissent argues that our reading of the statute renders the list of collateral payers in subsection (a) redundant because if the prisoner is responsible for all of his medical costs, then listing potential collateral sources for payment is unnecessary. - However, the enumeration of possible collateral sources serves at least three purposes: (1) it gives notice to potential collateral payers that they may be liable for medical costs if they are associated with a prisoner as described in the statute; (2) it provides prisoners with guidance about their payment and coverage options; and (8) it provides the DOC with a list of alternative payers to collect from. These are reasonable purposes that give meaning to this statutory language.
To satisfy the requirements of AS 33.30.028(b), DOC adopted the regulation found at 22 AAC 05.121. Subsection (b)(1) of this regulation requires a prisoner to make a co-payment for medical services provided to the prisoner by the department through department employees or contractors. Subsection (b)(2) requires a prisoner to arrange to obtain payment or coverage from one or more of the responsible parties set out in AS 33.30.028(a) for services not provided through department employees or contractors.
This portion of the regulation supports the distinction between in-house services and outside services that Pearce relies on. But the regulation does not conflict with our reading of the statute. Subsection (b) of the statute mandates that the commissioner charge prisoners at least a minimal amount for in-house services rendered. The regulation implements that command and properly goes no further. Like the statute, the regula *37 tion says nothing of divesting the prisoner lacking collateral resources of liability for outside services if the prisoner has adequate personal resources to pay for those services.[27] Indeed, the regulation makes no provision at all for the situation in which a prisoner without collateral resources has received outside services, which is appropriate in light of the statute's silence on the issue.
One could argue that our reading of dual liability would render portions of the regulation incomplete or redundant. For example, 22 AAC 05.121(e) states that "a prisoner may be charged for the full costs of health care services [provided by outside providers], resulting from a self-inflicted injury, or an injury to the prisoner or to another prisoner resulting from an assault or other violation of facility rules or state law...." This subsection seems unnecessary if AS 83.30.028(a) makes the prisoner liable for all medical care. But we read this subsection as a clarification that the department may collect full payment from a prisoner who inflicts an injury without regard to the minimum co-payment that would otherwise apply. Interpreted in this fashion, the regulation does not conflict with the our reading of AS 83.30.028(a).
The superior court's interpretation of this statute is also consistent with its legislative history. We have already recognized that the primary purpose of this statute is to reduce medical costs:
The primary goal of AS 83.30.028 is reducing medical costs: the legislation that led to the reimbursement statute's enactment was directed at controlling the costs incurred in correctional institutions, and the sponsor statement indicated the proposed measures would reduce some of the costs of inmate health care and allow [the State] to focus its limited budget on its true mission. Although the legislative history does not explicitly address extending Hability to former prisoners, preventing the State from collecting from prisoners to the fullest extent possible would contravene the statute's cost-saving purpose and is not justified by another interest evident from the face of the statute or its legislative history.[28]
In this case, the superior court's decision to include a prisoner's personal wealth among those resources subject to reimbursement is consistent with the statute's primary purpose of reducing the DOC's medical costs.
Moreover, the legislative record reflects an intent to take advantage of any financial resources to which a prisoner might have access. In a hearing before the House Finance Committee, a member of Representative Mulder's staff noted that "there will be individuals ... that will have other coverage or resources" and that "[the legislation allows the Department to become a secondary payer to the primary health care provider." [29] The staffer also stated that "the intent is to allow the Department to take advantage of other coverage that is available or to access the resources of someone that is independently wealthy." [30] These statements suggest that the committee intended that a prisoner's personal wealth be included within the coverage of this statute.
The dissent argues that, rather than cost-saving generally, the legislature had a more specific purpose in mind when it drafted the statute: "to deter frivolous prisoner medical complaints and the overuse of medical services." And the dissent argues that this more specific goal, while perfectly consistent with an overarching desire to cut costs, "outweighed any subsidiary goal of recovering costs." Although we do not agree with that view, even if it is taken as true, our reading of the statute is better suited to achieving this deterrence.
*38 Under our reading of this statute, a prisoner will be liable for medical costs, those rendered both in-house and outside the prison, whether or not he has collateral resources. This rule will certainly deter prisoners from overuse of medical services more than a rule relieving a prisoner of all responsibility. If Pearee's interpretation were adopted, there would be nothing to deter a prisoner from seeking outside care other than the requirement that he first obtain a referral from an in-house provider. But, whether or not prior approval is required, a prisoner's liability for the cost of outside treatment will also act as a reasonable deterrent. This is the same reasonable deterrent that affects patients outside a prison; any patient may reasonably choose to decline unnecessary medical services, especially if he has no collateral resources. If this statute was intended to deter unnecessary treatment by holding prisoners financially responsible for their treatment decisions, such deterrence will be mitigated if wealthy prisoners are relieved of their medical expenses.
Thus, there is no reason why wealthy prisoners should be exempted from liability in a bill designed either to deter over-use of medical services or to reduce costs. The dissenting opinion suggests that one possible motivation for such an exemption could be to reduce poverty and recidivism. But there is no indication that the legislature believed that making prisoners responsible for their own bills would promote recidivism. From the legislative history we have reviewed, it seems more likely that the legislature concluded that controlling these medical costs will allow DOC "to focus its limited budget on its true mission," [31] that is, to maintain correctional facilities, to provide necessary treatment, and to establish programs that are calculated to protect the public and promote rehabilitation.[32]
Medical services in this country are extremely expensive for all patients, both inside and outside prison walls.[33] Making law-abiding Alaskans responsible for their own health care decisions and excusing prisoners from such liability could be considered deeply unfair. Indeed, if the cost of paying for a prisoner's health care is absorbed by DOC, then the public will bear that cost in taxes or foregone opportunities.
In summary, the legislative history is consistent with a natural reading of AS 33.30.028(a), requiring a prisoner to be liable for the cost of all medical services provided or made available to the prisoner. The implementing regulation is not inconsistent with this interpretation. The superior court properly concluded that Pearce was liable for payment of the cost of outside medical care made available to him during his incarceration.
B. The Common Fund Doctrine Does Not Apply To The State's Reimbursement Claim.
 Pearce also argues that the superior court should have deducted a pro rata share of the attorney's fees he incurred pursuing the medical malpractice judgment from the funds the State retained to pay for his medical care. The common fund doctrine provides that a litigant or "lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. The doctrine is implicated any time one litigant's success releases well-defined benefits for a limited and identifiable group of others." [34]
The common fund doctrine has been applied to subrogation and class action cases where the plaintiffs attorneys obtained a specific recovery for the benefit of other *39 parties.[35] For example, when an employee recovers on a personal injury or wrongful death claim against a third party, a pro rata share of the employee's attorney's fees and costs is deducted from the workers' compensation lien for the same injury.[36] Likewise, when a hospital accrues a medical lien for care provided to an injured patient, the patient's attorney fees must be deducted before the lien is paid from a settlement for those injuries.[37] -
But the common fund doctrine should not be extended to general obligations that existed before the plaintiff's injury-obligations that were not dependent on the creation of a settlement fund. In Alaska Native Tribal Health Consortium v. Settlement Funds, this Court cited with approval the New Mexico Supreme Court's decision distinguishing indirect beneficiaries, such as utility creditors and mortgage holders, from the hospital that directly benefits from a hospital lien.[38] Other jurisdictions have declined to apply the common fund doctrine to general creditors of a plaintiff simply because the plaintiff's recovery creates a new asset.[39] In these cases, the plaintiff is not acting on behalf of its creditors in pursuing its claim. The creditors' claims are independent of the plaintiff's claim; the debts to the creditors exist regardless of the outcome of the litigation.
In this case, the medical expenses Pearce incurred in prison were unrelated to the injuries he sustained from medical malpractice. The State became Pearce's creditor for his unrelated medical expenses, but the State had no special lien on his malpractice recovery. Pearce's attorneys did not create any special. fund that benefitted the State, so the common fund doctrine does not apply to this recovery.
v. CONCLUSION
We conclude that AS 88.30.028(a) allows the DOC to seek reimbursement for the costs of outside medical care, and that the common fund doctrine does not apply to this case. We therefore AFFIRM the superior court's judgment.
STOWERS, Justice, not participating.
FABE, Chief Justice, with whom MAASSEN, Justice, joins, dissenting.

. AS 33.30.011(4)(A); State, Dep't of Corr. v. Hendricks-Pearce, HenP.3d 1088, 1089 (Alaska 2011) (citing AS 33.30.011(4)(A); Abraham v. State, 585 P.2d 526, 531 (Alaska 1978); Rust v. State, 582 P.2d 134, 143 (Alaska 1978)).

. Hendricks-Pearce, 254 P.3d at 1089-90 (citing 22 Alaska Administrative Code (AAC) 05.121(b) (2004).

. AS 33.30.028 provides, in relevant part:
(a) Notwithstanding any other provision of law, the liability for payment of the costs of medical ... care provided or made available to a prisoner committed to the custody of the commissioner is, subject to (b) of this section, the responsibility of the prisoner and the
(1) prisoner's insurer if the prisoner is insured ...;
(2) Department of Health and Social Services if the prisoner is eligible for assistance
[[Image here]]
(3) United States Department of Veterans Affairs if the prisoner is eligible for veterans' [medical] benefits ...;
(4) United States Public Health Service, the Indian Health Service, or any affiliated group or agency if the prisoner is [eligible]; and
(5) parent or guardian of the prisoner if the prisoner is under the age of 18.
(b) The commissioner shall require prisoners who are without resources under (a) of this section to pay the costs of medical ... care provided to them by the department. At a minimum, the prisoner shall be required to pay a portion of the costs based upon the prisoner's ability to pay.

. 254 P.3d 1088.

. Id. at 1090. "Dewell Pearce died in November 2009 and Anita Hendricks-Pearce, his estate's personal representative, was substituted in his place." Id. at 1090 n. 3. For ease of reference we use "Pearce" throughout this opinion to refer to both the

.Id.

.Id.

.Id.

.Id.

. Id.

. Id. at 1091.

. Id. at 1093.

. Id. at 1092.

. Id. at 1093.

. Id.

. Id. at 1093-95.

. Id. at 1095 n. 25.

. See 22 AAC 05.121(b) (providing that prisoners are financially liable for a co-payment for in-house medical care).

. AS 33.30.028(b).

. The superior court's order awards DOC a principal amount of $137,010.35 plus $12,720.60 in attorney's fees for a total of $149,730.95. The record does not indicate how the superior court arrived at the figure of $137,010.35; the State claimed to have spent $147,494.94 on outside medical care for Pearce and - withheld $140,847.00 from the final judgment award in the 2008 medical malpractice case. Neither party has appealed the amount of the award.

. Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs., 303 P.3d 431, 440 (Alaska 2013).

. Bartley v. State, Dep't of Admin., Teacher's Ret. Bd., 110 P.3d 1254, 1261 (Alaska 2005) (citing Union Oil Co. v. State, Dep't of Revenue, 560 P.2d 21, 23, 25 (Alaska 1977)).

. See Edwards v. Alaska Pulp Corp., 920 P.2d 751, 756 (Alaska 1996).

. Ward v. State, Dep't of Pub. Safety, 288 P.3d 94, 98 (Alaska 2012).

. Id. (internal quotation marks omitted).

. Estate of Kim ex rel. Alexander v. Coxe, 295 P.3d 380, 387 (Alaska 2013) (citing Oels v. Anchorage Police Dep't Emps. Ass'n, 279 P.3d 589, 597 (Alaska 2012)).

. In contrast, the regulation does state a different situation in which the department will not pursue payment: where certain inspections, examinations, or testing are required by other state regulations or are necessary to protect the health of others. See 22 AAC 05.121(c).

. - Hendricks-Pearce, 254 P.3d at 1092-93 (internal citations and quotations omitted).

. Minutes, House Finance Comm. Hearing on HB. 219, 19th Leg. ist Sess. (Apr. 20, 1995) (testimony of Dennis DeWitt, Legislative Assistant to Rep. Eldon Mulder) (emphasis added).

. Minutes, House Finance Comm. Hearing on H.B. 219, 19th Leg. ist Sess. (Apr. 20, 1995) (testimony of Dennis DeWitt, Legislative Assistant to Rep. Eldon Mulder) (emphasis added).

. Hendricks-Pearce, 254 P.3d at 1092-93.

. See AS 33.30.011.

. See, eg., Dan Mangan, Medical Bills Are the Biggest Cause of U.S. Bankruptcy, CNBC Health Care (June 25, 2013, 2:29 PM), http://www.cubc. comf/id/100840148; Jason Kane, Report: 1 in 3 Americans Burdened With Medical Bills, The Rundown, PBS NewsHour (March 8, 2010, 10:16 AM), http://www.pbs.org/newshour/ rundown/2012/03/report-a-third-of-americans-burdened-with-medical-bills.html.

. Alaska Native Tribal Health Consortium v. Settlement Funds Held For E.R., 84 P.3d 418, 433-34 (Alaska 2004) (internal quotations and citations omitted).

. Edwards v. Alaska Pulp Corp., 920 P.2d 751, 756 (Alaska 1996) (applying common fund analysis to class action case); Cooper v. Argonaut Ins. Cos., 556 P.2d 525, 527 (Alaska 1976) (applying doctrine to workers' compensation reimbursement statute).

. Cooper, 556 P.2d at 525-28.

. Alaska Native Tribal Health Consortium, 84 P.3d at 433-34.

. Id. at 435 (citing Martinez v. St. Joseph Healthcare Sys., 117 N.M. 357, 871 P.2d 1363 (1994).

. In re Key West Rest. & Lounge, Inc., 54 BR. 978, 985 (Bankr.N.D.Ill.1985); Watkins v. GMAC Fin. Servs., 337 Ill.App.3d 58, 271 Ill.Dec. 389, 785 N.E.2d 40, 45 (2003); TM Ryan Co. v. 5350 S. Shore, LLC, 361 Ill.App.3d 352, 297 Ill.Dec. 72, 836 N.E.2d 803, 811 (2005); Hilton Oil Transp. v. Oil Transp. Co., S.A., 659 So.2d 1141, 1154, n. 7 (Fla.Dist.Ct.App.1995); Villanueva v. Wolff, 175 N.J.Super. 430, 419 A.2d 1141, 1147 (N.J.Super.Ct.App.Div.1980); Leischner v. Alldridge, 114 Wash.2d 753, 790 P.2d 1234, 1237 (1990) (en banc).