*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MATTHEW FINK and DIANE WILKE, | ) ) ) | Supreme Court No. S-15614 |
| Appellants, | ) ) | Superior Court No. 3AN-07-12346 CI |
| v. | ) ) | O P I N I O N |
| MUNICIPALITY OF ANCHORAGE, | ) ) | No. 7126 – September 16, 2016 |
| Appellee. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Michael T. Stehle, The Law Office of Michael Stehle, PC, Anchorage, for Appellants. James M. Gorski, Hughes Gorski Seedorf Odsen & Tervooren, LLC, Anchorage, Robert P. Owens, Assistant Municipal Attorney, and William D. Falsey, Municipal Attorney, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Fabe, Winfree, and Bolger, Justices. [Maassen, Justice, not participating.]

STOWERS, Chief Justice.

## I.    INTRODUCTION

The dispute in this case concerns a narrow strip of land in the Turnagain area of Anchorage immediately west of Lynn Ary Park and bordering Knik Arm.  The

land is in the shape of a parallelogram; its long sides run in a northeasterly direction up Knik Arm and its short sides run north-south.[1]

The property was initially subdivided in May 1952 as part of Block K, Turnagain Heights Subdivision. As initially platted the northern subdivision boundary stopped just south of a 50-70 foot bluff. The bluff itself was just south of the mean high-tide line[2] of Knik Arm; the land between the northern boundary of the lots and the mean high-tide line was not developable land. Appellants Matthew Fink and Diane Wilke (the lot owners) currently own four of the six lots at issue in this case.

During the Good Friday Earthquake of 1964, the bluff face flattened out and slid northward into Knik Arm. This caused the existing land between the pre-earthquake bluff face and the pre-earthquake mean high-tide line to become developable and created new land between the pre-earthquake mean high-tide line and the post-earthquake mean high-tide line. Despite the plats of the subdivision apparently indicating that their lots' northern boundary is at the top of the pre-earthquake bluff face, the lot owners alleged that their property actually extends north to the pre-earthquake mean high-tide line. The parties do not dispute that the Municipality of Anchorage owns the new land between the pre-earthquake mean high-tide line and the post-earthquake mean high-tide line.

The Municipality argued that the lot owners did not have a substantial interest in the disputed property and that the statute of limitations barred the lot owners' claim. The superior court concluded that the lot owners failed to show a substantial

---

[1]     A diagram is attached as an Appendix.

[2]     The mean high-tide line along the south shore of Knik Arm created the original record for the northern boundary of the township and the property in dispute. The mean high-tide line is also known as the meander line.

interest in the disputed parcel and that, even if the lot owners did have a substantial interest, the statute of limitations barred their claim. We affirm.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

In 1943 Lynn Ary conveyed to Marvin Marston by warranty deed a piece of property in what is now the Turnagain area of Anchorage. On its face, this conveyance does not appear to extend to the pre-earthquake mean high-tide line; the northern boundary appears to terminate at the top of a 50-70 foot bluff face, short of the mean high-tide line.

In September 1946 Marston conveyed two deeds to Union Bank, one of which was a warranty deed conveying to Union Bank almost all of the 1943 conveyance from Ary to Marston except for a fifty foot strip of land on the western edge of the parcel.[3]

In June 1949 Ary conveyed to Marston via quitclaim deed the "Beachfront Deed," described as "[a]ll my right, title and interest to the Beach and Waterfront lying in front of the 550 feet originally sold to [Marvin] Marston out of the west side waterfront of the Lynn Ary Homestead and adjoining the Simonson Homestead." Marston recorded the Beachfront Deed in 1954, and he never conveyed the property to Union Bank. The ownership of the parcel described in the Beachfront Deed is at issue in this case.

Over the years several plats of the area were created and recorded. Plat P-67, recorded in July 1947, was a topography of the land owned by Ary and Marston.

---

[3]     The parties disagreed at trial on the nature of the interest Marston conveyed to Union Bank in 1946. The court determined that Union Bank received only a security interest from Marston, as opposed to a fee interest, and the Municipality does not contest that finding on appeal.

Plat P-67B was created in May 1948 and recorded in May 1952. A "Master Plan" for Turnagain Heights was created in April 1949. Plat P-67E was created in May 1952 and recorded in June of that year. Plat P-67E created a subdivision known as Block K, Turnagain Heights Subdivision. This subdivision essentially contains the land conveyed by Ary to Marston in 1943 and later from Marston to Union Bank in 1946. Each of the plats appears to indicate that the lots' northern boundary is at the top of the bluff face.

In September 1952 Union Bank conveyed via warranty deeds several lots in Block K, including Lots 2-5, the lots currently owned by Fink and Wilke. This deed was recorded on September 21, 1953. The lots changed hands a number of times over the years. In 1957 the owners of Lots 1-6 re-platted the lots as Lots 1A-6A in plat P-424. Marston owned Lots 1 and 2. The re-plat altered the internal boundary lines slightly, but it did not change the northernmost boundary. Plat P-424 is the current and official plat of the subdivision, and it is incorporated by reference into the deeds owned by Fink and Wilke. Fink purchased Lots 2A and 3A in 1991, and Wilke acquired Lot 5A in 2000 and Lot 4A in 2012.

When Block K was initially platted in plat P-67E, the northern boundary of the lots appeared to terminate in the north at a steep, 50-70 foot bluff, with tidal mud flats below. The 1964 Good Friday Earthquake seriously damaged the entire Turnagain area and caused the bluff face at the northern edge of Block K to flatten and slide northward toward Knik Arm. This slide created developable land on the former bluff face and mud flats and also created new land between the pre-earthquake mean high-tide line and the post-earthquake mean high-tide line.

In 1985-1986 the Municipality constructed the Tony Knowles Coastal Trail along the northern edge of the disputed property along the pre-earthquake mean high-tide line.[4]

The parties do not dispute that the Municipality owns the new land between the pre-earthquake mean high-tide line and the post-earthquake mean high-tide line; they only dispute whether the northern boundary of the disputed property terminated at the top of the bluff or at the pre-earthquake mean high-tide line at the base of the bluff.

**B.    Proceedings**

The owners of Lots 2A-5A sued the Municipality seeking relief under the Earthslide Relief Act[5] and to quiet title in the disputed property. Because those are both equitable claims, the lot owners did not request a jury trial. The Municipality answered the lot owners' complaint, brought legal and equitable counterclaims, and asserted that the lot owners' claims were barred by the statute of limitations; the Municipality also demanded a jury trial "on all issues so triable."

---

[4]    Around this time the Municipality sought to obtain easements from landowners in order to build the trail, but it claimed that it was unsure about the ownership of the disputed property. Although one lot owner stated that she received a letter from the Municipality requesting her consent to build the trail, the Municipality asserted that it never sent any such letters to the lot owners of Block K. Union Bank filed a lawsuit related to the construction of the Coastal Trail; the Municipality eventually settled with Union Bank and received via quitclaim deed Union Bank's interest in the disputed parcel. The superior court determined that Marston received the Beachfront Deed from Ary after he had conveyed property to Union Bank, and therefore Marston did not convey the disputed parcel to Union Bank. It also concluded that Marston had only conveyed a security interest in the property to Union Bank rather than a fee interest; given this conclusion, Union Bank could not have transferred a valid property interest in the disputed property to the Municipality. *See Wickwire v. City & Borough of Juneau*, 557 P.2d 783, 785 n.7 (Alaska 1976) (noting that a person must have an interest in real property to convey via quitclaim deed).

[5]    AS 09.45.800-.880.

The Municipality next moved for summary judgment to dismiss the lot owners' quiet title claim, arguing that the Municipality was in full possession of the disputed property.[6] The lot owners opposed and filed a Second Amended Complaint adding a claim for ejectment under AS 09.45.630 and an equitable claim for the cancellation of the quitclaim deed granted by Union Bank to the Municipality.

The superior court granted the Municipality's motion for partial summary judgment on the quiet title cause of action because the Municipality was in possession of the disputed parcel; the court noted that "possession is a required element of an action to quiet title" and that "the appropriate remedy [for a plaintiff not in possession of the property] is a suit in ejectment rather than a suit to quiet title."[7]

The Municipality then moved for summary judgment on the lot owners' request to cancel the Municipality's deed from Union Bank, arguing that the lot owners had an adequate remedy at law and were therefore prohibited from bringing equitable claims. The superior court denied the Municipality's motion but decided to bifurcate the trial and "first conduct a bench trial on the preliminary issue of who has proper title to the disputed property." It noted that because "the validity of the parties' competing title claims will be most similar to a common law quiet title action — a traditionally equitable action — the matter of title will be bench tried."[8] The court also determined that, while

---

[6] Under AS 09.45.010 a party bringing a quiet title action must be in possession of that property.

[7] *See Davis v. Tant*, 361 P.2d 763, 766 (Alaska 1961).

[8] *Cf.* Alaska Const. art. 1, § 16 ("In civil cases where the amount in controversy exceeds two hundred fifty dollars, the right of a trial by jury . . . is preserved to the same extent as it existed at common law."); *Pacific Coal & Transp. Co. v. Pioneer Mining Co.*, 205 F. 577, 579 (9th Cir. 1913); *McGill v. Wahl*, 839 P.2d 393, 396 (Alaska 1992).

the Municipality's affirmative defense of adverse possession is traditionally an equitable defense and therefore could be tried at the same time as the other equitable claims, "the interests of promoting settlement and providing a more orderly disposition of the case" required that "the matter of adverse possession should not be adjudicated until after there has been a resolution of the title issue."

Following the order bifurcating the trial and in order to narrow the issues at trial, the lot owners moved for a ruling from the court that P-424, the official plat of their lots, was ambiguous as to the lots' northern boundary. The superior court granted the motion; it determined that P-424 provided no indication of the original parties' intent and noted that lots are presumed to extend to the water's edge where there is no developable land platted between the lots and the water.[9]

After a seven-day bench trial, the superior court issued its findings of fact and conclusions of law. The court, while acknowledging that P-424 was ambiguous, found that Marston intended to reserve the land between the top of the bluff and the pre-earthquake mean high-tide line for himself.[10] The court agreed with the Municipality's surveyor, Stan Ponsness, and the deposition testimony of former Municipal surveyor, Tom Knox; the two explained that the description of the property

___

[9]     *See Estate of Smith v. Spinelli*, 216 P.3d 524, 530 (Alaska 2009) (finding that the boundaries of a plot of land were ambiguous where there was little developable land between the lots and the water).

[10]     The court also found that the ten-year statute of limitations barred the lot owners' claims because the construction of the Coastal Trail in 1986 provided the lot owners with inquiry notice, which started the statute of limitations. The statute therefore ran well before the lot owners filed suit in 2007. *See* AS 09.10.030(a) (setting a ten-year statute of limitations on actions for the recovery of real property).

in the deed led to a conclusion that the lots terminated at the top of the bluff.[11]  The court found that the platting history also supported the surveyors' conclusions; the northern boundary to the deeded tract was drawn at the top of the bluff on P-67, P-67B, and the "Master Plan" depicting Block K.  And the court found that plat P-67E clearly listed fixed bearings and distances from a new fixed point of reference that showed the plats as existing inland from the bluff face.  Plat 424, which was a re-plat of plat P-67E, maintained the dimensions of P-67E.

The superior court also referred to anecdotal evidence that suggested that the lots extended only to the top of the pre-earthquake bluff.  John Dillman, a municipal appraiser, spoke with then-current and former Block K lot owners in the course of appraising the value of the Coastal Trail easement through the area; the court found that Dillman had concluded that many of the then-current and former owners believed they had purchased bluff lots.  Brooke Marston, son of Marvin Marston, testified that his father intended to reserve the bluff face and beachfront to protect it from erosion.  One former lot owner, Judy Johanson, spoke to Marston before purchasing her lot and testified that Marston told her that her lot extended to the ocean, but the court determined that Johanson had misunderstood Marston's promise that no one would build in front of her lot.  Thus, the court concluded that the lot owners failed to meet their burden of proving title to the land superior to the Municipality's title.[12]  The lot owners appeal.

---

[11]     Knox reversed his deposition testimony at trial and stated his belief that the Beachfront Deed from Ary to Marston indicated that the two had simply forgotten about the 1943 conveyance.  The court found this explanation unpersuasive; it cited the fact that the 1949 deed referenced the 1943 deed as evidence that Marston and Ary did not forget what they had already done.

[12]     Because Marston had retained ownership of the disputed property, the court concluded that title to the property passed to Marston's foundation upon his death.

## III. STANDARD OF REVIEW

"We review factual findings for clear error and legal conclusions de novo."[13] "A factual finding is clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are definitely and firmly convinced that the finding is mistaken."[14] "Conclusions about the parties' intent drawn by the trial court after sifting and weighing . . . evidence [extrinsic to a deed] are conclusions of fact . . . ."[15]

The interpretation of a statute[16] and " '[w]hether a deed is ambiguous [are] question[s] of law,' and '[w]e review legal questions de novo, adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy.' "[17] "[W]hether the trial court applied the correct legal rule in exercising its discretion is a question of law that we review de novo . . . ."[18]

---

[13]     *Baker v. Ryan Air, Inc.*, 345 P.3d 101, 106 (Alaska 2015) (citing *Simone H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 284, 288 (Alaska 2014)).

[14]     *Id*. (quoting *Simone H.*, 320 P.3d at 288).

[15]     *Estate of Smith v. Spinelli*, 216 P.3d 524, 528 (Alaska 2009) (alteration and omission in original) (quoting *Norken Corp. v. McGahan*, 823 P.2d 622, 626 (Alaska 1991)).

[16]     *Jimerson v. Tetlin Native Corp.*, 144 P.3d 470, 472 (Alaska 2006) (citing *Kodiak Island Borough v. Roe*, 63 P.3d 1009, 1012 n.6 (Alaska 2003)).

[17]     *Estate of Smith*, 216 P.3d at 528 (fourth and fifth alterations in original) (footnote omitted) (first quoting *Norken Corp.*, 823 P.2d at 626; then quoting *Pastos v. State*, 194 P.3d 387, 391 (Alaska 2008) (last alteration in original) (footnote omitted)).

[18]     *Stanhope v. Stanhope*, 306 P.3d 1282, 1286 (Alaska 2013) (quoting *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005)).

"Bifurcation of a trial is generally within the discretion of a trial court, and a ruling on this issue will not be reversed absent an abuse of that discretion."[19] The determination of which party is the prevailing party is also subject to the trial court's discretion and is reviewable only for abuse of discretion.[20] "We will find an abuse of discretion when the decision on review is manifestly unreasonable."[21]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion When It Bifurcated The Title Claim From The Ejectment Claim.

Despite the Municipality's demand for a jury trial "on all issues so triable," the superior court first conducted a bench trial to determine ownership of the parcel before trying the lot owners' ejectment claim to a jury. The lot owners argue that the court erred by denying their right to a jury trial because an ejectment claim is an action at law that must be tried by a jury[22] and because they did not consent to a bench trial. The Municipality responds that the lot owners consented to a bench trial on their title claim. We conclude that, although the lot owners were initially entitled to a jury trial, they consented to a bench trial on the title claim and therefore waived their right to a jury trial as to that claim.

---

[19] *Sever v. Alaska Pulp Corp.*, 931 P.2d 354, 361 n.10 (Alaska 1996) (citing *A.M. v. State*, 891 P.2d 815, 828 (Alaska 1995)).

[20] *Continental Ins. Co. v. U.S. Fid. & Guar. Co.*, 552 P.2d 1122, 1125 (Alaska 1976), *disapproved of on other grounds by Farnsworth v. Steiner*, 638 P.2d 181 (Alaska 1981).

[21] *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015) (citing *Tufco, Inc. v. Pacific Envtl. Corp.*, 113 P.3d 668, 671 (Alaska 2005)).

[22] *See Shope v. Sims*, 658 P.2d 1336, 1339-40 (Alaska 1983) (concluding that an ejectment claim is an action at law).

The Municipality's answer to the lot owners' complaint timely requested a jury trial,[23] and the lot owners later added an ejectment claim, which is an action at law and therefore eligible for a jury trial.[24]  In *Shope v. Sims*, a case involving competing mining claims, we reversed a superior court ruling that dismissed the plaintiffs' ejectment claim and ordered a bench trial on the remaining equitable claims.[25]  We adopted the rule from *Beacon Theatres, Inc. v. Westover*[26] and held that "when a case involves both legal and equitable claims, the facts common to such claims must be tried to a jury if a proper demand is made."[27]  We noted, "By implying that the plaintiffs could maintain an ejectment claim only after they prevailed in the equitable claims, the superior court was essentially requiring the equitable claims to be tried first."[28]  In the case before us now, because the lot owners' legal and equitable claims both required showing a legal interest in the property, they were entitled to a jury trial unless they waived their right to a jury trial.[29]

---

[23]    *See* Alaska R. Civ. P. 38(d) ("A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties.").

[24]    *See* Alaska Const. art. 1, § 16 ("In civil cases where the amount in controversy exceeds two hundred fifty dollars, the right of a trial by jury . . . is preserved to the same extent as it existed at common law."); *Shope*, 658 P.2d at 1338-41.

[25]    *Shope*, 658 P.2d at 1338.

[26]    359 U.S. 500 (1959).

[27]    *Shope*, 658 P.2d at 1340.

[28]    *Id*.

[29]    *See* AS 09.45.630 (requiring a party seeking an ejectment to show a legal estate in real property and a present right to possession of that property); *Shilts v. Young*, 643 P.2d 686, 689 (Alaska 1981) (observing that a plaintiff in a quiet title action must

(continued...)

A jury trial, once demanded, "shall be by jury, unless . . . the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court, consent to trial by the court sitting without a jury."[30]  Here, after the superior court issued its bifurcation order, the parties jointly filed a Proposed Amended Pretrial Order.  That proposed order discussed the logistics for the bifurcated trial and stated that "the preliminary issue of who has superior title to the disputed parcel shall be decided during Phase 1 of the trial."  The Municipality argues that this proposed joint order constituted a written stipulation to a bench trial.  The Municipality further notes that the lot owners never objected to a bench trial after the superior court issued its order bifurcating the title issue from the ejectment claim.  We agree and conclude that the lot owners waived their right to a jury trial as to the title claim.

In *Hollembaek v. Alaska Rural Rehabilitation Corp.*, a case involving Hollembaek's default on a promissory note, both parties signed a pre-trial order stipulating to a bench trial.[31]  Hollembaek later requested a jury trial, but that request was not timely.[32]  Hollembaek argued on appeal that the pre-trial order could not be considered a waiver of his right to a jury because he did not know that he was agreeing to a bench trial and because he had no authority to waive trial by jury.[33]  But we noted

---

[29](...continued)
"at least prove that he has a substantial interest in the property and that his title is better than that of the defendant[]").

[30]     Alaska R. Civ. P. 39(a); *see also Hill v. Vetter*, 525 P.2d 529, 531 (Alaska 1974).

[31]     447 P.2d 67, 69 (Alaska 1968).

[32]     *Id*. at 68.

[33]     *Id*.

that Hollembaek's counsel made no specific motion to amend the pre-trial order and that we had previously upheld the binding effect of pre-trial orders in *Fairbanks Publishing Co. v. Francisco*.[34] In *Hollembaek* we determined that "[t]he effect of [Hollembaek's] counsel's signing of the pre-trial order, which was also signed by the judge, was to officially establish, as a rule governing the trial of the case, that trial was to be without a jury."[35]

In *White v. McGinnis*,[36] the Ninth Circuit interpreted Federal Rule of Civil Procedure 38(d), which provides that "[a] party waives a jury trial unless its demand is properly served and filed[;] [a] proper demand may be withdrawn only if the parties consent."[37] White had filed a civil rights claim and made a timely jury demand.[38] The trial court then notified the parties that the case was set for a bench trial, and White failed to object.[39] The Ninth Circuit noted that Rule 39(a)[40] requires an oral or written

---

[34] *Id.* at 69 (citing *Fairbanks Publ'g Co. v. Francisco*, 390 P.2d 784, 799 (Alaska 1964)).

[35] *Id.*

[36] 903 F.2d 699 (9th Cir. 1990).

[37] The rule for withdrawal of a demand for a jury trial under Federal Rule 38(d) is the same as that set out in Alaska Civil Rule 38(d), which provides that "[a] demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties."

[38] *White*, 903 F.2d at 700.

[39] *Id.*

[40] Federal Rule 39(a) of the Federal Rules of Civil Procedure provides:

When a jury trial has been demanded under Rule 38, the action must be designated on the docket as a jury action. The

(continued...)

stipulation by the parties withdrawing the jury trial demand, but it found that conduct by the parties that evinces consent and appears on the record is sufficient to constitute a proper withdrawal and waiver.[41] The Ninth Circuit subsequently held that White's failure to object to a bench trial was sufficient to waive his timely jury demand.[42]

Both of these cases support our holding that because the lot owners failed to object to a bench trial in any meaningful way after the superior court's bifurcation order and the parties' joint filing of the Proposed Amended Pretrial Order, the lot owners effectively waived their right to a jury trial on the title issue. We conclude the superior court did not abuse its discretion in conducting a bench trial on the title claim.

**B. The Superior Court Did Not Err When It Concluded That The Lot Owners Failed To Prove A Legal Interest In The Disputed Property.**

The lot owners contend that the superior court erred when it failed to grant them title to the disputed property. In order to prove their quiet title claims, the lot owners were required to show that they had a substantial interest in the disputed parcel and that their interest was superior to the Municipality's interest.[43] In order to prove their ejectment claim, the lot owners were required to show that they had a "legal estate" in the property and "a present right to possession of the property."[44] In a quiet title or ejectment action, the plaintiffs must prevail on the strength of their own title and not on

---

[40](...continued)
trial on all issues so demanded must be by jury unless . . . the parties or their attorneys file a stipulation to a nonjury trial or so stipulate on the record . . . .

[41] *White*, 903 F.2d at 701-03.

[42] *Id*. at 703.

[43] *Shilts v. Young*, 643 P.3d 686, 689 (Alaska 1981).

[44] AS 09.45.630.

the weakness of the defendants' title.[45] The lot owners claim that they have a substantial interest in the property because (1) the plat and evidence produced at trial were ambiguous as to the subdividers' intent; (2) they were presumed to have title; and (3) the court clearly erred when it found that Marston intended to reserve title to the disputed parcel. And the lot owners argue that their substantial interest in the property was superior to the Municipality's interest because the Municipality had no interest at all in the property. The superior court concluded that the lot owners failed to show a substantial interest in the property, and we hold that the court's conclusion was not error.

In order to determine whether the lot owners have a substantial interest in the disputed property, we must interpret their deed. "The touchstone of deed interpretation is the intent of the parties, and where possible, the intentions of the parties will be given effect."[46] "We have instructed that 'a three-step analysis should be employed in interpreting a deed' "[47]:

> "The proper first step in deed construction is to look to the four corners of the document to see if it unambiguously presents the parties' intent. . . . " If a deed when "taken as a whole" is open to only one reasonable interpretation, the interpreting court "need go no further." "Whether a deed is ambiguous is a question of law."
>
> Once a court determines that a deed is ambiguous, "the next step in determining the parties' intent is a consideration of the facts and circumstances surrounding the conveyance."

---

[45]     *Shilts*, 643 P.3d at 689 (quiet title action); *Wright v. Prior*, 417 P.2d 602, 603 (Alaska 1966) (ejectment action).

[46]     *Estate of Smith v. Spinelli*, 216 P.3d 524, 529 (Alaska 2009) (alterations and omission omitted) (quoting *Norken Corp. v. McGahan*, 823 P.2d 622, 625 (Alaska 1991); *Shilts*, 567 P.2d at 773).

[47]     *Id*. (quoting *Ashley v. Baker*, 867 P.2d 792, 794 (Alaska 1994)).

-15-                                      **7126**

We have noted that "this inquiry can be broad, looking at 'all of the facts and circumstances of the transaction in which the deed was executed, in connection with the conduct of the parties after its execution.' " "Conclusions about the parties' intent drawn by the trial court after sifting and weighing such extrinsic evidence are conclusions of fact," which we review for clear error.

Finally, only if the parties' intent cannot be discerned after an examination of the deed itself and the extrinsic evidence surrounding its creation should a court resort to rules of construction. "The purpose of rules of construction . . . 'is not to ascertain the intent of the parties to the transaction. Rather, it is to resolve a dispute when it is otherwise impossible to ascertain the parties' intent.' "[48]

In applying the first step of deed interpretation, the superior court examined the four corners of plat P-424 — the plat that the lot owners' deeds incorporated by reference — and found that the plat was ambiguous as to the subdividers' intent. The court noted that P-424 "does not demarcate or specify the location of the mean high water line. Nor does the plat provide any indication as to the location of the pre-earthquake bluff and tidelands in relation to the [lot owners'] lot boundaries." And the superior court noted that "since [the lot owners'] lots are platted alongside the Knik Arm — with no developable land platted in-between — there is a presumption that title to the abutting tidelands and bluff passed to [the lot owners]." We agree with the superior court's finding that P-424 is ambiguous as to the subdividers' intent.

The superior court then sought to determine the subdividers' intent by considering the facts and circumstances surrounding the conveyance, the second step of deed interpretation. The court concluded that the lot owners did not have a substantial

---

[48]     *Id*. (alterations and omissions in original) (footnotes omitted) (quoting *Norken Corp.*, 823 P.2d at 625-26, 629).

interest in the property, and it found that Marston retained title to the disputed property. The lot owners challenge the superior court's factual findings and argue (1) the court interpreted the plat to Block K in a way that ignored the surveying practices of the time, ignored that the plat was ruled ambiguous as a matter of law, and assumed consistency of the plats when such an assumption was actually inconsistent with historical events; (2) the court erred in its reading of the report by appraiser John Dillman; (3) the court's interpretation of Judy Johanson's testimony contradicted her actual testimony; (4) the court erred in interpreting Brooke Marston's testimony and erred when it admitted that testimony; and (5) the court ignored the fact that Marston never conveyed nor platted the disputed parcel, and he did not include the parcel in his estate.[49] We do not agree with the lot owners that the superior court's findings were clearly erroneous.

### 1. The court's interpretation of the platting history

The lot owners argue that the court clearly erred when it determined that the historical plats as drawn supported a finding that their lots did not extend to the mean high-tide line. The lot owners refer first to the court's earlier determination that plat P-424 was ambiguous, and they argue that the plats created ambiguity rather than resolved it. Although the superior court did find ambiguity in plat P-424, it found that the platting history suggested a common scheme of leaving space between the northern boundary of the lots and the mean high-tide line. The court examined P-67, P-67B, the "Master Plan," and P-67E, and it noted that each clearly reserved space between the northern boundary of the property and the mean high-tide line. The superior court found that "the documentary evidence consistently shows that the developers of Turnagain

---

[49] The lot owners also challenge the superior court's finding that the property passed to the Marston Foundation after Marston's death. But that finding was not essential to the result, which was that the lot owners failed to show that they had a substantial interest in the property. We therefore decline to address this issue.

Heights Subdivision intended to establish the north boundaries of the bluff lots well back from the edge of the bluff adjacent to Knik Arm. The plats involving the bluff lots of Block K all have the bluff lots terminating at the top of the bluff, approximately 170 feet from the mean high-water line."

The lot owners highlight former surveyor Clarence Herschbach's testimony; he stated that the northern boundary was possibly drawn as a matter of convenience rather than for accuracy. He testified that at the time of the original platting it was common practice not to survey mud flats because surveying was too expensive considering the marginal benefit provided by the mud flats. He also testified that surveying practices in the 1940s and 1950s led to mathematically incorrect boundaries. Finally, Herschbach testified that he worked closely with the surveyor who surveyed the disputed parcel and explained that he seemed to be "a mediocre surveyor [by today's standards]" but that he "[took] it seriously" and was "better than most" surveyors in Anchorage at the time. The lot owners assert that, although the plats seem to establish a common plan or scheme, the plats really only follow the initial inaccurate survey.

The lot owners' interpretation of the platting history is one possible interpretation; the superior court's interpretation that the plats suggest a common scheme is another possible interpretation. "When reviewing factual findings we ordinarily will not overturn a trial court's finding based on conflicting evidence, and we will not re-weigh evidence when the record provides clear support for the trial court's ruling; it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[50] The lot owners failed to present evidence that would

---

[50]  *See In re Adoption of S.K.L.H.*, 204 P.3d 320, 325 (Alaska 2009) (quoting *Tessa M. v. State, Dep't of Health & Soc. Servs.*, 182 P.3d 1110, 1114 (Alaska 2008)).

compel us to find the superior court's findings to be clearly erroneous. We therefore affirm the superior court's findings.

## 2. Other evidence at trial

In addition to the documentary evidence of the platting history, the superior court evaluated the testimony of several people familiar with the subdivision of the area and other documents. First, the court analyzed the Dillman report, an appraisal of the disputed parcel commissioned by the Municipality in 1991 as part of the Municipality's litigation with Union Bank. Dillman's report ultimately concluded that Block K was incorrectly platted and that the boundary of the plat was actually 170 feet north of the platted boundary. But the superior court focused on Dillman's discussions with Block K lot owners, many of whom indicated their belief that they had purchased "bluff lots" that did not extend to the pre-earthquake mean high-tide line.

Dillman's ultimate conclusion that the lots extended to the pre-earthquake mean high-tide line is consistent with the testimony of Judy Johanson, a former lot owner who had signed plat P-424. Johanson testified in a deposition that Marston told her that "no one could ever build in front of [her], that [her] land went clear down to the [water]." But the superior court found that Johanson had misinterpreted Marston's promise; it found that Marston had only meant that no one would build in front of her because he retained ownership of the property.

The lot owners contend that the testimony of Brooke Marston, Marvin Marston's son, either supports their argument that their lots extend to the pre-earthquake mean high-tide line or that it at the very least creates ambiguity in the conveyance history. Brooke testified regarding a variety of statements attributed to his father from

conversations that took place over fifty years ago.[51]  The superior court found that Brooke's statements supported the conclusion that Marston intended to reserve the bluff face and the land to the mean high-water mark for himself.  And it found that its interpretation of Brooke's testimony was the only way to harmonize the testimony with the historical plats, the deed history of the waterfront, and the lot owners' understanding of their northern boundary.

The evidence presented is subject to different interpretations.  Dillman's report did indicate that the lots were not properly platted, but his is but one interpretation.  And he did speak with lot owners who believed they purchased "bluff lots."  Brooke Marston's and Johanson's testimony involved conversations that took place many years ago; there is little documentary evidence to support either set of statements.[52]  Again, we will not overturn or re-weigh a trial court's factual findings in the face of conflicting

---

[51]  Brooke testified that his father "voiced to [him] that he would not deed out land that he owned beyond the face of the cliff, because then he [could not] stop the erosion [of the bluff] himself."  But he also seemed to indicate that his father had already sold much of the land out to the mean high-tide line when he said that "[he was] not going to sell anything more, even though [he owns] it, out to beyond the bottom of the bluff, so [he] can control it [himself.] [He doesn't] have to go convince people that they've got to do it."  And Brooke testified that his father had an ongoing campaign "to stop the bluff from eroding and he would talk to owners that he had already sold to, that owned that area."  The lot owners objected to Brooke's testimony as hearsay, but the statements are contradictory and do not influence the result of this appeal.

[52]  The lot owners additionally contend that, if Marston retained the disputed parcel for himself, he would have platted the parcel and conveyed it either through his will or into the Marston Foundation, where he conveyed other pieces of property before he died.  That mere possibility does not convince us that the superior court's factual findings are clearly erroneous.

evidence when the record supports those findings.[53]  The record supports the court's findings, and we perceive no clear error.

We affirm the superior court's conclusion that the lot owners failed to show a substantial interest in the property.[54]

**C.      The Superior Court Did Not Err When It Concluded That The Earthslide Relief Act Did Not Apply To The Lot Owners' Property.**

The lot owners presented an alternative claim for relief under the Earthslide Relief Act, contending that their lots shifted as a result of the 1964 Good Friday Earthquake and that the Act compels the court to pass title to the "disputed remnant" to them.  The Act provides:

> If the boundaries of land . . . have been moved by an act of God, consisting of an earthslide, so that they are in a location different from that at which, by solar survey, they were located before the earthslide, an action in rem to recognize the boundaries as they presently exist and to quiet title within the boundaries in the persons judicially found entitled to title . . . is authorized . . . .[55]

The lot owners contend that the 1964 earthquake caused the ground underlying their lots to liquefy, the bluff to collapse, and the land to "spill[] seaward carrying the houses with it. . . .  It is undisputed that the northern boundary of [the land owners'] lots moved during the 1964 earthquake.  If flags had been placed on the northern boundary of the

---

[53]      *See In re Adoption of S.K.L.H.*, 204 P.3d at 325 (quoting *Tessa M.*, 182 P.3d at 1114).

[54]      Because the lot owners failed to show that they have a substantial interest in the property, we also conclude that the superior court did not err when it declared the Municipality to be the prevailing party.  And, because the lot owners failed to show a substantial interest in the property, we decline to address the superior court's ruling that the lot owners' claims are barred by the statute of limitations.

[55]      AS 09.45.800.

lots there can be no question that those flags would have been moved northward."

In support, the lot owners supplied a scholarly article about the Turnagain Heights Landslide.[56]  According to the article,

> The largest of [the slides in the Anchorage area] was along the coastline in the Turnagain Heights area.
>
> . . . .
>
> Lateral movement of the soil mass during the slide was extensive.  The material from the original bluff line moved out into the bay as much as 2,000 ft in some places . . . , and, in general, the outward movement beyond the original bluff line mirrored the extent of inland regression of the slide behind the bluff line.

But the superior court determined that the boundary of the lot owners' property had not shifted, despite the fact that the surface had been modified:

> The northern lot boundaries depicted in Plats P-67E and P-424 were not changed by the 1964 earthquake even though the land itself was modified.  Nothing in the vicinity interferes with re-establishing the original monuments and dimensions of the Plat P-424 subdivision.  Although the physical location of the mean high-tide changed after the 1964 earthquake, the original location of the mean high-tide line was depicted on the 1916 [Bureau of Land Management's General Land Office] survey and can be readily re-established by a competent surveyor today. The parcel at issue, therefore, remains north of the original Block K subdivision lots, between the lots and the [mean high-water] line of Knik Arm.

---

[56]    The article provided by the lot owners in the excerpt of record is a reprint "with minor changes" from the original article.  The original article appears in the *Journal of the Soil Mechanics and Foundation Division*.  H. Bolton Seed & Stanley D. Wilson, *The Turnagain Heights Landslide, Anchorage, Alaska*, 93 J. SOIL MECHANICS & FOUNDATIONS DIVISION 325, 325 (July 1967).

The lot owners argue that "to read the Act as the superior court does renders it superfluous . . . [because] [i]t is always possible to superimpose the old geographical boundaries on the altered landscape. In that case, the Act would never apply." But the lot owners' argument is refuted by *Brown's Boundary Control and Legal Principles*,[57] a learned treatise recognized at trial: "Where a slide results from . . . an [earthquake], the owners undoubtedly own where their bedrock is located. In the Alaskan earthquake the shaking caused land to become fluid, and it ran into the bay. *In such instances land boundaries could not flow with the surface material.*" (Emphasis added.) In essence, although the surface of the property shifted, the boundaries of the property itself remained in the same place.

We have never interpreted the Earthslide Relief Act.[58] The interpretation of the Act presents a question of law.[59] "When we interpret . . . statutory language we begin with the plain meaning of the statutory text. The legislative history of a statute can sometimes suggest a different meaning, but 'the plainer the language of the statute, the more convincing contrary legislative history must be.' "[60]

The plain language of the Act focuses on whether the property boundaries were moved by an earthslide, such that they are in a different location from their original

---

[57] WALTER G. ROBILLARD, DONALD A. WILSON & CURTIS M. BROWN, BROWN'S BOUNDARY CONTROL AND LEGAL PRINCIPLES 412 (5th ed. 2003).

[58] We declined to interpret the Act in *Estate of Smith v. Spinelli*, 216 P.3d 524, 533 (Alaska 2009), instead ruling on other grounds.

[59] *See State, Dep't of Revenue v. Municipality of Anchorage*, 104 P.3d 120, 122 (Alaska 2004) ("We apply our independent judgment to questions of law such as statutory interpretation . . . .").

[60] *Hendricks-Pearce v. State, Dep't of Corr.*, 323 P.3d 30, 35 (Alaska 2014) (footnote omitted) (quoting *Ward v. State, Dep't of Pub. Safety*, 288 P.3d 94, 98 (Alaska 2012)).

location. The Act does not further explain how a court should make this essentially factual determination.[61] The trial court thus relied on the evidence presented by the parties, including learned treatises, to make its findings.

The Report of the House Judiciary Committee on Committee Substitute for House Bill No. 427 suggests the Act's intended applicability:

> After the earthquake it was found that an area approximately west of L Street in Anchorage moved about nine feet to the west and four feet to the north. This sliding of the earth created a problem in real property locations and descriptions because the plat of the Original Townsite no longer represents the actual location of the property.[62]

The example referenced in the Report of the House Judiciary Committee — the area west of L Street in Anchorage — was also referenced in a letter from Anchorage Assistant Attorney Victor Carlson, sent in support of the proposed Earthslide Relief Act.[63] Carlson explained:

> For example, in the area termed the "L" Street Slide Area (roughly north of 9th Avenue and west of "L" Street in Anchorage) the land has shifted with most of the buildings, trees, fences, etc. intact. The owners and others having an interest in this group approximately of 300 lots describe their holdings by reference to a certain lot and block of the plat of the original townsite of Anchorage. After the earthslide by referring to this plat many property owners would find they

---

[61] AS 09.45.800 (permitting actions only where "the boundaries of land . . . have been moved by . . . an earthslide, so that they are in *a different location from that at which . . . they were located before the earthslide*" (emphasis added)).

[62] Report of House Judiciary Committee on Committee Substitute for House Bill No. 427, House Journal Supp. No. 17 at 1, 1966 House Journal 777.

[63] Letter from Victor D. Carlson, Anchorage Assistant City Attorney, to House Judiciary Committee (Mar. 17, 1966).

are encroaching on their neighbors and on the public right-of-way, likewise the streets are encroaching on private property. There is a need to have the official plat represent the truth of the land boundaries as shifted.[64]

It is notable that the circumstances described in this letter and by the House Judiciary Committee materially differ from those presented in this appeal.

The west L Street example shows a situation where the earth's surface shifted in the earthslide, carrying with it buildings, trees, fences, streets, etc. located on the ground above. The situation in the lot owners' case is different: here the surface material liquified and flowed northbound, but there is no evidence in the record that the underlying bedrock shifted, or that the surface shifted carrying buildings and other fixtures, and encroaching on others' properties.

Of greater importance, given that the superior court found that the northern boundary of the disputed property lay across the top of the bluff — a finding that we affirm — it follows that the owners of the disputed properties had no interest in the land that constituted the bluff. When that land slid northward and flattened out, it became developable by the owners of that land, and new land was also created in the Knik Arm. But the lot owners' predecessors in interest had no interest in either the shifted bluff land or the new land. And the boundaries of the lots they own remained readily identifiable. This result and the superior court's conclusion are entirely consistent with the passage quoted above from *Brown's Boundary Control*: "In such instances land boundaries could not flow with the surface material."[65]

We conclude that the superior court did not err in ruling that the Earthslide Relief Act does not apply to the disputed property.

---

[64]    *Id*.

[65]    ROBILLARD ET AL., *supra* note 55, at 412.

## V.  CONCLUSION

We AFFIRM the superior court's decision to bifurcate the trial, AFFIRM the superior court's determination that the lot owners did not have a substantial interest in the disputed property, and AFFIRM the superior court's conclusion that the Earthslide Relief Act does not apply to this case.



N
W E
S

Knik Arm

Post-1964 Mean High-Tide Line

Pre-1964 Mean High-Tide Line

Disputed Parcel

Lynn Ary
Community Park

Coastal Trail

1A

2A

3A

4A

5A

6A

Block K